UNITED STATES of America

v.

**Murdo Francis MARGESON**
and
**William Joseph Crehan.**
**Crim. A. No. 22383.**

United States District Court
E. D. Pennsylvania.
Sept. 16, 1966.

Drew J. T. O'Keefe, U. S. Atty., Robert St. Leger Goggin, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Paul T. Smith, Manuel Katz, Daniel Klubock, Boston, Mass., for defendant, Murdo Francis.

F. Lee Bailey, Boston, Mass., for defendant, William Joseph Crehan a/k/a James T. Grant.

## OPINION

JOHN MORGAN DAVIS, District Judge.

The defendants in this action are charged with conspiracy and with the robbery of the Cheltenham Branch of the Fidelity-Philadelphia Trust Company on October 18, 1965 in violation of Title 18 U.S.C. §§ 2113(a), 2113(b) and 2113(d). The matters now before us are their motions for suppression of evidence, for severance, and for dismissal of the indictment.

Pursuant to these motions the Court held a hearing to ascertain the facts surrounding the arrest of the defendants and the seizure of evidence.

### I.

At about 3:00 o'clock in the afternoon of October 18, 1965, a Lieutenant Castellucci, an off-duty policeman, was sitting at the counter of a Howard Johnson restaurant in Ridgefield Park, New Jersey, having something to eat. He observed two men enter and sit at the counter only a short distance from him. One of them was the defendant Crehan. They were dressed in casual clothes with Crehan wearing an expensive looking "golf sweater" and sport shirt. They conversed very little, had a tendency to be "fidgety", and were constantly looking out of the window. The Lieutenant heard one of them say, "He should be here soon." After about fifteen or twenty minutes, the defendant Margeson entered the restaurant and approached the two sitting at the counter. They seemed less uneasy when he appeared. He had a small "drug store type bag" with him, which he placed on the counter, and within a short time, Crehan got up and walked out with it. He entered his car, made a U-turn, and stopped in front of the office of the Howard Johnson Motel which adjoined the restaurant. The Lieutenant was able to record the license plate number of his automobile.

Shortly thereafter, the third individual, Kadra, got up and walked out, leaving Margeson alone. Two or three minutes later, he returned, whispered something in Margeson's ear, and the latter passed him something which sounded like a string of keys. He then left the restaurant.

At this point, Lieutenant Castellucci, being an off-duty policeman from a different municipality, decided to call the local police and inform them as to what he had observed. His suspicions had been aroused when he first saw Crehan and Kadra sitting at the counter in their casual but expensive attire. The subsequent demeanor and conduct of all three increased these suspicions. He had not seen them commit any crime and did not know what they were doing, but he was convinced in his own mind that something was wrong. He thought they might be bookies or maybe dope peddlers, especially when one of the men had passed a small bag to one of the others. However, he readily admitted that his thoughts were based only on a "sixth sense," a "pure hunch."

In response to the phone call, Sergeant Toleno (hereinafter referred to as "Sergeant") of the Ridgefield Park police department came to the restaurant to see Lieutenant Castellucci. The latter explained his observations to the Sergeant and rode around the parking lot looking for the three men and for the car Crehan had driven. Although none of the men was in sight at this time, the Lieutenant was able to point out the car.

After giving the Sergeant all the information he had, the Lieutenant left the scene and had nothing further to do with the events that subsequently unfolded. The Sergeant, for his part, checked the Motel register to determine if the car allegedly belonging to Crehan was registered to one of the guests. He learned that it was listed under the name of a James T. Grant in Room 45.

Returning to police headquarters, the Sergeant checked the stolen car alarms but nothing appeared on this vehicle. He then made a short report and discussed the entire matter with his Chief, Elmer J. Thompson (hereinafter referred to as the "Chief"). Three factors led them to their decision to investigate the matter further: first, that very room had been the subject of a narcotics raid some months before; secondly, they felt obligated to check out a situation which a police officer from another jurisdiction had thought suspicious enough to call to their attention; and thirdly, they had had some trouble with that particular motel in the past. However, the Chief candidly admitted that he had no information indicating that the two defendants were committing, were about to commit, or had committed a crime of any kind.

Chief Thompson and Sergeant Toleno arrived at the Motel sometime between 4:50 and 5:00 P.M. Having checked the motel registration card which listed the occupant of Room 45 as James T. Grant of Holyoke, Massachusetts, a "representative" with "G. E. Company," they proceeded to Room 45 and knocked on the door. A male voice responded "Who's there?" Thompson replied "I am Chief of Police, and I would like to talk to you." After a momentary pause, the voice stated, "Just a minute, Chief, I am dressing." During the next few seconds the Chief heard muffled voices and things being shuffled about in the room. Thereupon, he sent the Sergeant to cover the rear door of the motel room. The Chief knocked on the door again and the response this time was "Give me a minute, Chief." He heard the sound of footsteps coming toward the door and then the chain lock on the door being moved. When the Chief heard the footsteps moving away from the door, he realized the occupant was locking rather than opening it. He decided to head for the rear entrance where he had sent Sergeant Toleno.

In the meantime, the Sergeant, after identifying himself, had stopped Margeson who had come running or at least hurrying out of the rear door of Room 45 with an attache case in his arms. While the Sergeant did not prevent him from opening the door of his car and placing his attache case on the seat, he did ask him if that were his automobile and requested his identification. He complied by handing him his driver's license and registration which showed no discrepancy. It was at this point that the Chief arrived at the parking lot from inside the motel.

Upon reaching the back of the building, the Chief saw the Sergeant standing in the parking lot with Margeson. He also observed Crehan striding out of the doorway toward him. Crehan was carrying a "fairly large" cardboard carton in both arms at chest level. After identifying himself as the Chief of Police, Thompson asked the defendant where he was going with the box, and the latter answered that he was going to put it into his car. The Chief pursued his questioning by asking him what was in the carton, and the reply was "Some clothes and things." Thompson then ordered him to come forward and place the box down in front of him. Crehan complied without protest. The Chief, all

during this time, had his coat pushed aside and his hand on his revolver as a precautionary measure. He testified, however, that he was only detaining Crehan and not arresting him at this point although he admitted that he would have prevented him from walking away if he had tried to do so.

Once the defendant had put the box down, the Chief directed him to walk out to the center of the parking lot where the Sergeant was standing with Margeson. Thereupon, the Chief looked at the box more closely. He observed that it was filled almost to the top, but all he could see were innocuous brown paper bags. Keeping one eye on Crehan, Margeson, and his Sergeant, he leaned over, put his hand into the box, and felt what seemed to him to be a revolver. He testified that he did this for two reasons; first, because his suspicions were aroused and he believed that the defendant was trying to hide something; and secondly, because he was concerned for his personal safety and that of his Sergeant.

After this cursory examination of the cardboard carton and without saying a word about his discovery either to the defendants or to his Sergeant, the Chief followed Crehan to the center of the lot and asked him for identification. While waiting for it, he asked him why he had not opened the door. Crehan answered that he had not given him enough time and that he first wanted to put the box in the car before opening the door. He then produced either a driver's license or an automobile registration card with the name James Grant and an address in Springfield, Massachusetts. The Chief noticed the discrepancy between the address listed there and the one on the motel register, which indicated Holyoke, Massachusetts. When asked about it, Crehan stated that he had moved recently and had not as yet changed the address on his license or automobile registration. The Chief then inquired as to what his business was. Crehan replied that he as a TV Salesman. In response to the Chief's question as to why he had described himself as a G. E. Company representative on the motel register, he answered rhetorically, "Didn't G. E. make televisions?" After Thompson said that he assumed they did, Crehan retorted, "Well, I sell them."

The Chief turned to Margeson and asked Sergeant Toleno to hand to him Margeson's driver's license and car registration. The Sergeant had already checked them against this defendant's car and had found no discrepancy. The Chief then asked him who he was and what he was doing in this motel. He said that he was a salesman, was not registered there, but was only visiting Crehan. He did not use Crehan's name but only pointed to him. He appeared nervous.

At this juncture the Chief, not being satisfied with the answers to his questions and cognizant of the gun in the box, told them that they were both under arrest. Crehan immediately asked upon what charge they were being held. The Chief told him that he was arresting them under the disorderly person's statute for failing to give a "good account" of themselves. The Chief and the Sergeant then for the first time frisked them.

The police took the two defendants and the carton to the police station whereupon the Chief proceeded to inspect the carton without having obtained a search warrant. He found under the paper bags covering the top, three loaded revolvers, several "grotesque" halloween type masks, gloves, caps, numerous license plates from various states, a pouch full of ignition keys, and a locked night depository bag bearing the legend "Fidelity-Philadelphia Trust Co." During the examination of the contents of the box, Margeson bolted from the police station but was quickly apprehended. The police searched him thoroughly and discovered $1200.00 tucked under his belt. They also searched Crehan and found $595 in his wallet. None of the bills was bait money from the Fidelity-Philadelphia bank robbery.

At the station house, about twenty minutes after the two defendants had been formally placed under arrest, Toleno for the first time told the Chief that he had allowed Margeson to place into his car the attache case he was carrying when he stepped out onto the parking lot. The Chief instructed the Sergeant to return to the scene and procure it. The police opened it at the station, finding it to contain a large amount of cash and various denominations including what turned out to be several hundred dollars in bait money. Again no search warrant had been obtained.

The Chief notified the Philadelphia Police and The Federal Bureau of Investigation after the defendants had been booked and locked into individual cells. It was not until this time that the Chief or his police department learned of the robbery of the Fidelity-Philadelphia Trust Company in Cheltenham, Pennsylvania.

On the following day, the F. B. I., armed with a warrant, searched Room 45 and seized some $2,000.00 and various articles of clothing.

## II.

The first legal issue that has been raised is the question as to exactly when in the chain of events the arrest of the two defendants occurred. The defendant Crehan contends that he was arrested as soon as the Chief placed his hand on his revolver and ordered him to stop and put down the box. Margeson argues that he was arrested when Sergeant Toleno stopped him in the parking lot. The government maintains that neither was apprehended until the Chief told them they were under arrest for failure to give a good account of themselves.

It is unnecessary for us to determine the moment when the arrest took place or to decide what constitutes an arrest or when if ever the police may detain a person without such detention constituting an arrest. See United States v. Boston, 330 F.2d 937 (2nd Cir.) cert. denied 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964); Brinegar v. United States, 165 F.2d 512 (10th Cir. 1947), aff'd 338 U.S. 160, 69 S.Ct. 1302, 93 L. Ed. 1879 (1949); Jenkins v. United States, 161 F.2d 99 (10th Cir. 1947); Cf. Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) (Majority and dissenting opinions); Schook v. United States, 337 F.2d 563 (8th Cir. 1964). Under either the government's position or the position of each defendant, the result on the issue of suppression of evidence will be the same.

 It is well settled that evidence seized incident to a lawful arrest will not be suppressed on the grounds of an illegal search. See United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). It is also well established that an arrest without a warrant is valid under the Fourth and Fourteenth Amendments of the United States Constitution, provided that it is based on probable cause that the person arrested was committing or had committed an offense. E. g., Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). As the Court said in the recent case of Beck v. Ohio supra 379 U.S. at 91, 85 S.Ct. at 225:

> "Whether [an] arrest was constitutionally valid depends * * * upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."

 This concept of probable cause lies somewhere between suspicion and sufficient evidence to convict. See

Brinegar v. United States, supra 338 U.S. at 175, 69 S.Ct. 1302; Henry v. United States, supra 361 U.S. at 102, 80 S.Ct. 168. However, " * * * good faith on the part of the arresting officers is not enough." Henry v. United States, supra at 102, 80 S.Ct. at 171. "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests [interests of the individual versus the interests of society]. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." Brinegar v. United States, supra 338 U.S. at 176, 69 S.Ct. at 1311.

In determining whether probable cause existed to arrest the two defendants in this case, it must be stressed that neither the Chief nor the Sergeant nor Lieutenant Castellucci had the slightest indication or suspicion that Crehan and Margeson had been involved in a bank robbery. Both the Chief and the Sergeant testified that they did not know of the hold-up of the Fidelity-Philadelphia Trust Company until after the defendants had been arrested and taken to the police station.

The Chief and his Sergeant relied on the hunch of an off-duty policeman from another jurisdiction in going to the Motel to investigate the defendants. They had not seen the defendants and knew nothing about them except what the Lieutenant had told the Sergeant. The Lieutenant himself knew neither Crehan nor Margeson nor Kadra nor anything about their backgrounds. His information was founded solely on observing their conduct for about a half-hour, and from such observation, he inferred that they might be involved in gambling or, possibly narcotics. He saw none of the "normal" paraphernalia associated with these crimes and heard nothing incriminating the defendants in such activities.

■■ While it was well established that the police may rely on hearsay in-

formation as the basis for probable cause, such information must come from reliable informers or at least from persons known to have more than bare suspicions about criminal activity. See Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Costello v. United States, 298 F.2d 98 (9th Cir. 1962). The police may not engage in a bootstrap operation; they may not create probable cause from the mere suspicions of another, even if he be another policeman, where there is otherwise no grounds for it. See Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

The Chief admitted that at the point when he first knocked on the door of Room 45 at the motel, he had absolutely no grounds or probable cause upon which to arrest the occupants. We agree with that conclusion and will therefore focus our attention on the events that transpired thereafter.

After the knock when the Chief clearly identified himself, Crehan stalled the officers by saying that he was getting dressed, and Margeson ran, or at least hurried, out the back door. Crehan soon followed suit and proceeded out the same way carrying a cardboard box with paper bags on the top. At this point, the police had no further information about the occupants except that for some reason they did not want to talk to the police and were fleeing out the back door of their room in order to avoid them. The Chief and his Sergeant had seen no evidence that the defendants were engaged in numbers or narcotics traffic. They had not observed slips of paper or anything looking like drugs, and they did not know these men to have engaged in such criminal activity in the past. Furthermore, they knew that the defendants were in a public place where at least one of them had registered to stay. When the police arrived at the parking lot behind the motel and had stopped the defendants, all the information they had to establish probable cause was the flight

of the defendants plus the bare suspicions already passed on from Lieutenant Castellucci.

■■ Flight, coupled with other factors, such as the knowledge of the defendant's prior criminal record or the sight of contraband or screams for help or reliable information that defendant had attempted to commit or had committed a crime, may be strong indication that there is something that those fleeing wish to hide from the police and may constitute probable cause for arrest. See Payne v. United States, 111 U.S.App. D.C. 94, 294 F.2d 723, cert. denied, 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961); Bell v. United States, 108 U.S. App.D.C. 169, 280 F.2d 717 (1960); Manucy v. United States, 272 F.2d 201 (5th Cir. 1960); Green v. United States, 104 U.S.App.D.C. 23, 259 F.2d 180 (1958); United States v. One 1951 Cadillac Coupe, 139 F.Supp. 475 (E.D. Pa.1956). However, flight, in and of itself, is not sufficient to constitute probable cause for otherwise anyone, who does not desire to talk to the police and who either walks or runs away from them would always be subject to a legal arrest. Such a procedure cannot be countenanced under the Fourth and Fourteenth Amendments as presently interpreted by the Supreme Court.

In the case of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court had occasion to discuss the question of probable cause underlying the arrest of one James Wah Toy. The federal narcotics authorities had arrested one Hom Way for the possession of heroin. Hom Way, who had never previously been an informer, told the agents that he had purchased the narcotics from one "Blackie Toy," proprietor of a laundry on a certain street. They proceeded to an establishment run by James Wah Toy on that street, but there was no evidence that he and "Blackie Toy" were one and the same person. Toy appeared at the door in response to the agent's knock, and the agent told him he was calling for his laundry. Toy told him to come back later as he had not as yet opened his business for the day. When Toy began to close the door, the agent announced "I am a federal narcotics agent." Toy immediately slammed the door and began to run into the interior of the building. The officer broke down the door, followed him, pulled a gun as he reached into a drawer, arrested him, and after questioning, elicited information about someone who sold narcotics. The Court held that there was no probable cause to justify an arrest. It stated that Hom Way was not known as a reliable informer; he did not tie "Blackie Toy" with James Wah Toy; and nothing appeared in the record showing that the Federal Authorities had anything tying the two together. The Court also dealt with Toy's flight and stated that since the officer initially misrepresented himself, the flight of Toy was ambiguous conduct and "thus signified a guilty knowledge no more clearly than it did a natural desire to repel an apparently unauthorized intrusion." Wong Sun v. United States supra, at 483, 83 S.Ct. at 415.

While *Wong Sun* is distinguishable from the case at bar in that the police chief here unequivocally identified himself, it is interesting to note that the Supreme Court went on to say that the question of flight to justify probable cause and flight to corroborate proof of guilt at trial are inextricably related and that the court has "consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime." Wong Sun v. United States, supra, at 483 n. 10, 83 S.Ct. at 415; See also Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L. Ed. 528 (1896); Alberty v. United States, 162 U.S. 499, 16 S.Ct. 864, 40 L.Ed. 1051 (1896); Hickory v. United States, 160 U.S. 408, 16 S.Ct. 327, 40 L. Ed. 474 (1896). See also Cooper v. United States, 94 U.S.App.D.C. 343, 218 F. 2d 39 (1954); Vick v. United States, 216 F.2d 228 (5th Cir. 1954).

In Taglavore v. United States, 291 F. 2d 262 (9th Cir. 1961) a police inspector

of Fairbanks, Alaska, suspected that the defendant was in someway involved with narcotics. After arresting the defendant's boss on a narcotics charge, he sent two of his investigators out to find the defendant. He gave them a warrant for his arrest, not for a narcotics offense but for two minor traffic violations. Shortly thereafter, they saw the defendant as he was about to enter a bar. One of them shouted to him, "I have a warrant for your arrest." Defendant immediately took his left hand out of his pocket and placed it to his mouth. He then turned around and ran toward the door of the taproom. The police stopped him, and choked him until he regurgitated the object he had placed in his mouth. It turned out to be narcotics. After deciding that the arrest warrant had been a mere sham, the Court went on to deal with the issue of probable cause to arrest for narcotics. It held that the Inspector's statement to his two subordinates that "there was an excellent possibility appellant would have some marijuana cigarettes in his possession" added to the defendant's placing of his hand to his mouth and his attempted flight were not enough to constitute the probable cause sufficient for a valid arrest. These facts were certainly stronger for the purpose of establishing probable cause than those presently before us; yet, the court found none to exist.

Two recent decisions of our Brothers Judge John Lord and Chief Judge Clary have dealt with the question of probable cause where flight was involved. United States v. Bostic, 251 F.Supp. 306, E.D. Pa., March 3, 1966 (Opinion by Judge Lord); United States v. Bostic, 258 F. Supp. 977, E.D.Pa., July 14, 1966 (Opinion by Chief Judge Clary). The case came before Judge Lord on a motion to suppress and before the Chief Judge at trial where the motion to suppress was renewed. The defendants, wearing rain coats, rain hats and dark glasses, had walked into a bank several minutes before closing time on December 2, 1965. One of the defendants approached a teller's window and placed a shopping bag on the counter. The other defendant stood near the door, looking back and forth between it and his companion. The teller who had been approached was balancing her day's receipts and was not open for business. The defendant said nothing to her. She immediately became suspicious and left her place at the window to notify her superiors. At that point, a police car arrived, and a policeman alighted from it. One of the defendants then said to the other, "Let's get the hell out of here." They departed from the bank with alacrity. Two Philadelphia plain clothes detectives who were engaged in a "stakeout" in the bank to prevent holdups during the holiday season ordered the uniformed policeman to give chase. The defendants were apprehended a few blocks away, where a shotgun was found at the feet of one and a pistol upon the person of the other. Both the Chief Judge and Judge Lord refused to suppress this evidence on the ground that probable cause existed for the arrest and that the search was incident thereto.

It seems reasonable to us for the court to find probable cause where one defendant goes to a closed teller's cage and acts suspiciously, and the other, standing at the door as a lookout man, signals him to leave when he sees a uniformed policeman approach. In the case at bar, however, the defendants fled the motel room where one of them was properly registered. The inference of crime is certainly a great deal weaker under these circumstances than under those in the *Bostic* case, supra where the defendants fled from a bank.

 Although the factual situation of every case in this area of the law is *sui generis,* we are compelled to hold that no probable cause existed at the point where the officers stopped the progress of Margeson and Crehan in the parking lot. A pure hunch of a third person that several men having something to eat in the afternoon at a lunch counter are engaged in unlawful conduct when the person observing them knew nothing about their background and saw no real indication of criminal activity

is not sufficient to pass the constitutional mandate of probable cause. In fact the Chief admitted he had absolutely no evidence that Margeson and Crehan were engaged in the numbers racket, in narcotics, or in anything else when he knocked at the door of Room 45. The added element of flight, especially when the Chief and his Sergeant did not know whether the defendants were the persons Lieutenant Castellucci had seen, does not bring us beyond the level of suspicion. We have found no case where the flight has been sufficient to constitute probable cause where the other factors indicating criminal activity have been so slight.

█ Since there was no probable cause at this point, the act of the Chief in finding the revolver on placing his hand in the box cannot be considered a legal search incident to a valid arrest.

█ The government, however, contends that the police chief had a right to frisk the suspect and the box he had been carrying in order to protect himself,[1] and that the fruits of that frisk may be introduced into evidence against him.

The government's argument is inapposite as it applies to the facts of the present case because we do not have a frisk or patting down which led to the discovery of evidence but rather a full search. It was only when the officer had placed his hand into the carton that he had any indication that it contained revolvers or that the defendants were carrying weapons. In fact, at this point, he had not even frisked the persons of either defendant.

█ Even assuming without deciding that the Constitution differentiates between the frisk and the search and requires a less formidable standard for the former than for the latter, we cannot believe that the Supreme Court would emasculate the doctrine of probable cause to such an extent as to permit a search as occurred here whenever a policeman, with less than probable cause, believes his life to be in danger. Such a result would legalize countless searches under a rule grounded on some concept of suspicion. We have found nothing from the higher federal courts to suggest that such a development in our constitutional law is to be anticipated or countenanced. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Henry v. United States, supra; Brinegar v. United States, supra; Weeks v. United States, supra. Cf. People v. Rivera, 14 N.Y.2d 441, 252 N.Y.S.2d 458, 201 N.E. 2d 32 (1964). People v. Peters, 18 N.Y. 2d 217, 273 N.Y.S.2d 217, 219 N.E.2d 595 (July 7, 1966).

### III.

We now come to the series of events relevant to the formal arrest of the two defendants under the New Jersey "good account" Statute. The Chief had initially asked Crehan why he did not open the door, and Crehan replied that he did not give him enough time. He had wanted to put the cardboard box in the car before receiving him. The Chief proceeded to interrogate the defendants further and looked at their licenses or car registration cards. Sergeant Toleno had checked Margeson's, which appeared in order. Chief Thompson noticed a discrepancy in Crehan's address from that on the motel register, but the latter explained it by saying that he had just moved and had not yet had his license changed, an explanation that the Chief admitted was a perfectly plausible one that he had heard many times before from law-abiding citizens. Crehan's statements as to his occupation were con-

---

1. The Chief testified that his motive for putting his hand in the carton was twofold; self-protection of himself and his sergeant and curiosity. With reference to the former motive, however, he did not investigate the contents of the box until after he had ordered Crehan to walk to the middle of the parking lot. Secondly, he never informed the Sergeant of the revolver and neither he nor the Sergeant ever patted down the defendants until after he told them they were under arrest.

sistent with what he had placed on the motel register. Upon being questioned, Margeson stated that he was a salesman who was simply visiting the other defendant. The Chief then arrested the defendants under a New Jersey statute, N.J.Stat.Ann. 2A:170–1 which provides:

"Any person who is apprehended and cannot give a good account of himself, or who is engaged in an illegal occupation and who is in this state for an unlawful purpose, is a disorderly person. In any prosecution under this section the fact that the person apprehended cannot give a good account of himself or is engaged in an illegal occupation is prima facie evidence that he is present in this state for an unlawful purpose".

 In order for the arrest on this charge to be valid, not only must the officer have had probable cause to believe that the defendants were violating the statute, independent of the prior illegal search, but also the statute itself must be constitutional.

 We must first ascertain the meaning of this law before we can possibly say that the Chief had probable cause to arrest the defendants under it. This inquiry leads us directly to one of our constitutional questions—whether the statute is void for vagueness under the Due Process Clause of the Fourteenth Amendment. Implicit in our system is the notion that laws defining criminal conduct should be sufficiently exact so that the individual is apprised of what is and what is not proscribed. The phrase that obviously gives us great concern here is the one dealing with the failure of the accused to "give a good account of himself". What is a "good account?" The New Jersey courts have not defined it, and we must confess that to us it is insufficiently precise to pass muster under the Fourteenth Amendment.

In Giaccio v. Pennsylvania, 382 U.S. 399, 402–403, 86 S.Ct. 518, 520, 15 L.Ed. 2d 447 (1966), the most recent Supreme Court case to discuss the vagueness question, the court stated:

"A law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."

In an older case Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), the Court put the rule of law in a similar vein when it held a New Jersey criminal statute void because of the vagueness of the word "gang". The Opinion stated at 453, 59 S.Ct. at 619:

" * * * [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."

We believe that the term "good account" fails to pass these tests. It leaves too much discretion in the hands of the police and the courts. It does not involve a certain standard, for what may be a good account to one person may very easily not be one to another. The word "good" is especially subjective in nature and is used in our parlance in many different ways and contexts. Does it mean "morally good" or does it mean "lawful" in the sense that if one does not admit to a crime he has given a good account of himself? On the other hand, "good account" may mean an account which puts the accused above suspicion or it may mean that his statement must give the officer sufficient credible information so as to negate probable cause.

In addition, the statute imposes no time limit on "good account." Does it require a person to give a "good account" of himself as of the moment the officer stops him or must he be prepared to explain and defend his conduct and whereabouts since he entered the state? One

cannot tell how far back in time he may have to justify himself or his activities in order to avoid the criminal penalties of the statute.

▇ Even assuming that the statute establishes a sufficiently definite standard so as to avoid any problems of vagueness, we face the question of whether or not the presumption built into the Act is constitutionally infirm. The law provides that a person who cannot give a good account of himself and is in the state for an unlawful purpose is a disorderly person. It then goes on to state that the failure to give a good account is prima facie evidence that one is in the state for an unlawful purpose simply if he fails to give a good account of himself. The constitutional test was set forth in Tot v. United States, 319 U.S. 463, 467–468, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943):

"* * * [A] statutory presumption cannot be sustained if there be no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience. * * * [W]here the inference is so strained as not to have a reasonable relation to the circumstances of life as we know them it is not competent for the legislature to create it as a rule governing the procedure of courts."

In that case, the court was concerned with the Federal Firearms Act which made it unlawful for anyone who had been convicted of a crime to receive any firearm in interstate commerce. Applying its test, the court held that there was no rational connection between the possession of firearms and the acquisition of them from interstate commerce, and that no inference could be drawn that the weapon was received subsequent to July 30, 1938, the date of enactment.

The Supreme Court had occasion to discuss the problem of statutory presumptions in its recent decision United States v. Romano, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965). The defendant was charged with the possession, custody, and control of an illegal still under 26 U.S.C. § 5601(a) (1). Section 5601 (b) (1) provided, however, that the presence of the defendant at the distilling apparatus would be sufficient to convict under § 5601(a) (1) unless he satisfactorily explained his presence. Invoking the standard of *Tot*, the court held the presumption to be invalid. It stated that while presence at a still probably meant that the defendant was somehow involved in the scheme, one could not reasonably infer that he was in possession, custody, or control as opposed to being involved in some operational activity not connected with the above categories.

In the case at bar, we find no rational connection between failure to give a good account and presence in the state for an unlawful purpose. The failure to give a good account "or" the giving of an account "less than good" cannot reasonably be equated with the term "unlawful." Many things may not be "good," but it does not follow that they are necessarily unlawful; moreover, many things may be lawful, but they may be less than good.

The statute does not even go so far as to say that failure to engage in good conduct creates a presumption that one is in the state for an unlawful purpose.

It is one step removed. It provides instead that unlawful purpose may be inferred from a failure to give a good account of oneself. Thus, unless a person stopped by the police is able to give what the officer deems to be a "good account" of himself no matter what he has been doing, he may be presumed to be in the state for an unlawful purpose. This law has in effect reversed the ancient adage by providing that words speak louder than actions.

We find no rational connection between the fact to be proved and the fact to be presumed so that the statute must fall for this additional reason.

The government argues, however, that the New Jersey cases have construed the statute to require more than the failure

to give a good account of oneself and that the state must also prove that the accused is in the state for an unlawful purpose.

The case most heavily relied upon by the government is McNeilly v. State, 119 N.J.L. 237, 195 A. 725 (1937), from the former New Jersey Supreme Court which at the time was an intermediate appellate tribunal. The court stated that if all the prosecution had to prove was the defendant's failure to give a good account of himself, the statute would be unconstitutional, but that the Act required the additional factor that the defendant be "present in this State for an unlawful purpose." Although it would seem from this language that the court was vitiating the statutory presumption, it goes on to uphold the presumption on the basis that there was a rationale connection between the fact to be proved and the fact to be presumed. The court then deepened the enigma by concluding with the somewhat less than lucid sentence, "[a]nd notwithstanding the presumption * * * the prosecutor must, nevertheless, under all circumstances, properly prove the guilt of the accused in accordance with the standards prescribed by our law." McNeilly v. State, supra, at 242, 195 A. at 728.

In State v. Catalano, 30 N.J.Super. 343, 104 A.2d 705 (1954), the Superior Court, Appellate Division, which is presently the New Jersey intermediate appellate tribunal, was faced with the conviction of a defendant who allegedly had been wandering the streets and was seen peering into a woman's bedroom in the early hours of the morning. He was arrested and convicted under the same statute involved in this case.

The court declared that the prosecution must prove that the defendant could not give a good account of himself and that he was in the state for an unlawful purpose. It then proceeded to say that the former raises a rebuttable presumption of the latter and that for the presumption to lose its force and effect, "sufficient evidence [must be] adduced so that (apart from the presumption)

reasonable men might honestly differ as to whether or not that is the fact * * *." State v. Catalano, supra at 347, 104 A.2d at 707.

Since the presumption had disappeared in *Catalano*, the court reversed on the grounds that the state had not proved the unlawful purpose, which in that case, was the intent to have unlawful sexual intercourse.

Cannon v. Krakowitch, 54 N.J.Super. 93, 148 A.2d 213 (1959), a more recent case from the Superior Court, Appellate Division, involved a civil action for damages for false imprisonment under the New Jersey "good account" statute. In discussing the act, the opinion said that the state must establish that the defendant has failed to give a good account of himself and that he is in the state for an unlawful purpose.

It added that proof of "the first element raises a rebuttable presumption as to the second." Cannon v. Krakowitch, supra at 98, 148 A.2d at 215.

The Supreme Court of New Jersey, presently the highest court in the state, passed upon the statute in State v. Salerno, 27 N.J. 289, 142 A.2d 636 (1958). The police had arrested one Tamburello while he was transferring cans of alcohol from a larger to a smaller truck on a vacant lot in Newark. The officers then waited in the event someone else might arrive. The defendant appeared in due course and was arrested five feet from the truck. In answer to the questions of the police, he gave his name and stated that he had entered the lot to relieve his bowels but declined to explain a slip of paper found on his person containing names, locations, and numbers.

The defendant contended that the "good account" provision was unconstitutionally broad and that the statutory presumption was invalid under Tot v. United States, supra. The court seemed to uphold the presumption by saying, "Usually provisions for a good account are associated with conduct or circumstances in themselves offensive or suggestive of

an intent to commit a crime." State v. Salerno, supra 27 N.J. at 296, 142 A.2d at 639. It then went on to refer to the statement in McNeilly v. State, supra, that the statute would be unconstitutional if it required no further proof than that the defendant was unable to give a good account of himself. At this point, the court recognized that the constitutional issues were "formidable" and expressly declined to reach them in view of the fact that it was reversing the conviction on the ground of no evidence of a specific unlawful purpose.

From this holding, it might seem that the court was saying, in a somewhat oblique manner, that proof of a specific unlawful purpose was necessary to obtain a conviction, regardless of the statutory presumption. However, from the facts of the case, it appears that the accused introduced evidence to explain his presence on the vacant lot and his possession of the slip of paper. Consequently, the rebuttable presumption had undoubtedly disappeared.

From the New Jersey authorities, it is at best unclear whether or not the presumption has been read out of the statute but it seems that if the defendant fails to give a good account of himself and puts on no evidence to rebut the presumption, he still may be convicted. In any event, the government's contention that the cases have definitely eliminated the statutory presumption is without merit.

We have found any arrest of the defendants when they were initially stopped in the parking lot to be invalid. We have also held any apprehension based on the discovery of the revolver in the carton to be unlawful. Finally, we have determined the formal arrest under the New Jersey "good account" statute to be invalid. In short, we have been unable to discover any ground for probable cause, independent of an illegal search, that would lead us to sustain their arrests. The Court has no alternative therefore but to suppress all the evidence obtained as a result of the detention and apprehension of the defendants. The suppression, of course, includes the evidence obtained from Margeson's car some fifteen or twenty minutes after their arrest and that seized from the motel room the next day. All of this proof was the fruit of the initial illegal search.

Even if the arrests were valid, the money found in Margeson's car must be suppressed for the additional reason that the search was too remote in time and place to be incidental to the arrest.

In Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) a case similar to the one now before us, the local police in Newport, Kentucky had received a telephone call at 3:00 A.M. that three men acting suspiciously had been seated in a car for several hours in the business district. The officers who went to the scene were not content with the "unsatisfactory and evasive" answers to their queries and arrested the three for vagrancy. The police searched them and took them to headquarters. The car was not searched at this time but was driven by an officer to the station and then towed to a garage. Shortly after the men had been booked and held in custody, some of the policemen went to the garage and searched the automobile. They found loaded revolvers and other paraphernalia of a criminal nature. The Supreme Court assumed without deciding that the arrest was legal but held the search unlawful because it was made without a warrant. It reiterated that the reason for permitting a search without a warrant when it was incidental to an arrest was to prevent a defendant from destroying evidence in his control and to deny him the use of any weapons that might be nearby. The Court asserted, however, that there was no indication that the three occupants of the car could have used any weapons or destroyed evidence at the time of the search since they were in jail. Moreover, there was no danger that the car would be moved out of the jurisdiction.

Likewise, in the case at bar, the two defendants had been in custody at the station house for about 20 minutes when the police took the attache case from Margeson's car and opened it without having obtained a warrant. There was no testimony that the police feared that the automobile was going to be moved. On the basis of the reasoning in the *Preston* case, supra, the money contained in the attache case cannot be considered the fruit of a search incidental to a lawful arrest and must be suppressed. See United States v. Rabinowitz, supra; Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Carroll v. United States, supra; Staples v. United States, 320 F.2d 817 (5th Cir. 1963); Rent v. United States, 209 F.2d 893 (5th Cir. 1954).

### III.

The defendants have also moved for the return of the evidence that we have suppressed. Specifically, Crehan has asked for the return of $500 more or less taken from his person and the box containing three masks, three guns with bullets, three caps, gloves, keys in a leather pouch, numerous sets of old license plates, a bag of bank wrappers, a padlocked canvas bank bag containing money and checks, a jacket, garbage bags, and shopping bags. Margeson for his part has moved for the return of $1200 more or less found on his person, the attache case containing $20,000 more or less taken from his automobile, and some rubber bands.

Rule 41(e) of the Federal Rules of Criminal Procedure provides:

> "A person aggrieved by an unlawful search and seizure may move the district court \* \* \* for the return of the property and to suppress for the use as evidence anything so obtained \* \* \*. If the motion is granted the property shall be restored unless otherwise subject to lawful detention \* \* \*."

From the facts gleaned at the suppression hearing, there is strong evidence that the checks and money seized, which included bait money, was the fruit of the robbery committed at the Cheltenham Branch of the Fidelity-Philadelphia Trust Company. Consequently, they come within the provision of Rule 41(e) which subjects them "to lawful detention." In addition, we consider the masks, guns, bullets, keys, gloves, license plates, bank wrappers, and the padlocked canvas bank bags to be criminal implements here or at least contraband. They fall within the same proviso of Rule 41(e) and will not be returned at this time. See Trupiano v. United States, 334 U.S. 699, 710, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); United States v. Howell, 240 F.2d 149 (3d Cir. 1956); Welsh v. United States, 95 U.S.App.D.C. 93, 220 F.2d 200 (1955); United States v. Scott, 149 F.Supp. 837, 842 (D.D.C. 1957). We will, however, restore the box, the three caps, the jacket, and the garbage and shopping bags to Crehan and the rubber bands and the attache case without the money to Margeson.

Our failure to return any of the other property is, of course, without prejudice to the right of the defendants to initiate any appropriate legal proceedings to establish their title to it.

### IV.

Both defendants have also moved for a severance. Crehan contends that Margeson's flight and attempted escape from the police station would be highly prejudicial to him if they were tried together. He also claims that Margeson made certain statements to the police inculpating him, but none of them was brought to the court's attention at the hearing.

Margeson contends that Crehan made statements implicating him in the crime and that the portions which implicated him cannot be severed from the others so as to remove the prejudice that will result. Here again, none of the statements was produced at the hearing held before this court.

Rule 8(b) of the Federal Rules of Criminal Procedure provides:

> "Two or more defendants may be charged in the same indictment or

information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. * * * "

Rule 14 provides:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

From the indictment and the facts which appeared at the suppression hearing, it is evident that the government intends to prove that the defendants were not only engaged in a conspiracy but were involved to the same extent and in the same manner in the robbery. The proofs in each case will be largely if not entirely overlapping.

 The question of severance here is a matter within the sound discretion of the court. Opper v. United States, 348 U.S. 84, 94–95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Mesarosh, 13 F.R.D. 180 (W.D.Pa.1952). After careful review of all the arguments and relevant factors, we conclude at this time that any prejudice that might exist does not outweigh the economy and expedition of a single trial. See United States v. Howell, 240 F.2d 149 (3d Cir. 1956); Note. Joint and Single Trials under Rules 8 and 14 of the Federal Rules of Criminal Procedure, 74 Yale L.J. 553 (1965).

## V.

 Finally, the defendant Margeson has moved for dismissal of the indictment on the ground that it was based on evidence illegally seized. The government admits that the basic evidence produced at the hearing on the motion to suppress was the evidence submitted to the grand jury.

The Supreme Court in Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) was faced with the question whether a defendant may stand trial and his conviction be sustained where only hearsay evidence was presented to the grand jury. The Court held that the indictment and the subsequent trial and conviction were valid and refused to establish a rule of law allowing a defendant to challenge the indictment because of "inadequate or incompetent evidence" presented to that body. The Court stated at page 364, 76 S.Ct. at 409:

"No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial."

We are not unmindful that *Costello* could be distinguished because it involved hearsay evidence to which litigants have always objected primarily because of the inability to engage in cross-examination. Historically this privilege has never been afforded before the grand jury so that the presentation of hearsay to that body would not seem to impair the rights of the defendant.

We are also cognizant of at least one opinion and several articles supporting a more liberal inquiry into the conduct of the grand jury when it is alleged that unconstitutionally obtained evidence was submitted. United States v. Tane, 329 F.2d 848 (2d Cir. 1964); Note, "Disclosure of Grand Jury Minutes to Challenge Indictments and Impeach witnesses in Federal Criminal Cases." 111 U.Pa.L. Rev. 1154 (1963); Note, "Exclusion of Incompetent Evidence from Federal Grand Jury Proceedings" 72 Yale L.J. 590 (1963); Note, "Self Incrimination by Federal Grand Jury Witness: Uni-

274

form Protection Advocated," 67 Yale L.J. 1271 (1958). Cf. Jones v. United States, 119 U.S.App.D.C. 284, 342 F.2d 863, 864 (1964) (Compare majority and dissenting opinions.) However, since there is no contention that the grand jury here was illegally constituted or biased, we feel precluded, absent any further indication from the Supreme Court or the Court of Appeals of our circuit, from interfering with the functioning of that body. We will abide by the well reasoned rule and rationale of Costello, supra. The defendant's motion to dismiss the indictment must be denied. See Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); United States v. Labate, 270 F.2d 122 (3d Cir.) cert. denied. sub nom. Sussman et al. v. United States, 361 U.S. 900, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959); Coppedge v. United States, 114 U.S.App. D.C. 79, 311 F.2d 128 (1962).

## ORDER

And now, this 16th day of September, 1966 it is hereby ordered that the motions of the defendants Murdo Francis Margeson and William Joseph Crehan a/k/a James T. Grant for the suppression of all the evidence seized as a result of their detention and apprehension be and the same is granted.

It is further ordered that the motions of the defendants for the return of evidence be and the same is denied except that the box, the three caps, the jacket, and the garbage and shopping bags shall be returned to the defendant Crehan and the rubber bands and the attache case without the money shall be returned to the defendant Margeson.

It is further ordered that the motions of the defendants for a severance be and the same is denied.

It is further ordered that the motion of the defendant Margeson for the dismissal of the indictment be and the same is denied.