STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. AN-
GELO SPECIALE, JOSEPH CACCIOLA, JOHN A. VIERA
AND DOMINICK F. FAGGIOLE, DEFENDANTS-APPEL-
LANTS.

Superior Court of New Jersey
Appellate Division

Argued October 24, 1966—Decided July 5, 1967.

(1)

2 

Before Judges Conford, Foley and Leonard.

*Mr. Albert S. Gross* argued the cause for appellants.

*Mr. Harold N. Springstead,* Assistant Prosecutor of Bergen County, argued the cause for respondent (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney).

Per Curiam. Defendants appeal from their conviction of breaking and entering with intent to commit larceny, *N. J. S.* 2A:94–1, and of knowing and unlawful possession of burglary tools with intent to use them unlawfully, *N. J. S.* 2A: 94–3. The case was tried to a jury. The sole ground of ap-

peal is that the seizure of defendants' shoes by the police after their arrest was an unlawful invasion of their constitutional rights.

Defendants did not testify in this case. The State's proofs showed the following. The Paramus Diner is situated on Route 17, a north-south highway. The Rounders Restaurant is located 116 feet south of the diner. At about 4 A. M. on July 26, 1965 Wilford Teague, a truck driver, parked his car at the rear of the diner which was then open for business. (The restaurant closed at 3 A. M.) Teague noticed defendant Cacciola and three other men drive up in a car which they parked in front of his. Teague, who was also a part-time special patrolman of the Borough of Paramus, entered the diner with another truck driver, Vincent Terhune. Shortly thereafter Cacciola entered the diner.

Teague, Terhune and Mrs. Frances Donohue, a waitress then on duty, told basically the same story as to Cacciola's conduct within the diner. He ordered some food and then left the diner proper through a rear door leading to rest rooms and telephones. He did this about six or seven times. Teague testified that the intervals during which Cacciola was out of sight were too brief for use of the men's room, and Frances Donohue similarly felt he was not using the telephone. Teague became suspicious and called the police department.

Patrolman Garris of the Paramus Police arrived at 4:20 A. M. in response to the call. While conversing with Teague, Garris observed three men walking from the rear of the restaurant toward the diner. He ordered them to stop. They "started to split up in three directions." Garris again ordered them to stop. They hesitated and then came over to the officer. Garris asked them for identification, but they were unable to produce any. In response to his inquiry concerning their presence behind the restaurant they stated that they had been urinating behind the building. When Garris asked them why they did not use the facilities of the diner and join Cacciola with whom they admitted having been, they

simply said that they did not want to go in the diner. Garris informed them that they were under arrest as disorderly persons for failure to give a good account of themselves, see *N. J. S.* 2A:170–1, and prepared to take them to the police station in his car. Just before they left, Cacciola emerged from the diner and came to the car. On request he produced identification and was not then arrested. He was subsequently arrested at about 9:30 or 10:00 A. M. the same day. Garris identified Speciale, Viera and Faggiolc as the three men he had arrested.

At about 6 A. M. Frances Donohue found a valise of burglar tools behind the restaurant. At about 7:30 A. M. Detective Majcher of the Paramus Police investigated and found evidence of attempted burglary. He observed a heelprint in the soil near a window at the southwest end of the restaurant building, made a plaster cast impression of it, and took samples of soil found on the outside window ledge at this part of the building. He also found a heelprint on the interior ledge and a soiled heelprint on a rug beneath the window. Additionally, he took samples of pink and gray paint from a door to the ladies' lounge, which appeared to have been forced, and fragments of paint from the frame of the door to the photography room, which also appeared to have been forced.

At the station house Captain Elliot questioned Speciale, Viera and Faggiole briefly as to their presence behind the restaurant and their knowledge of the burglar tools which had been taken to the station. He terminated his questioning when defendants refused to answer. He then went to the Rounders Restaurant and after investigating and conferring with Detective Majcher returned to the station and, as he put it, arrested them for breaking and entering "in addition to" the arrest for disorderly conduct. They were then asked for their shoes. They complied with the request and the shoes were turned over to Majcher. The shoes, together with the soil, paint samples, heelprints and burglar tools were sent to the F. B. I. laboratory for analysis.

Special agent Thompson of the F. B. I. testified that soil from the bottom of Speciale's shoes matched generally the samples taken from the window ledge and areas just beneath the window, both inside and outside the building, and that the paint from the door of the ladies' lounge matched paint chips on two chisels found in the bag of burglar tools, in color, texture, layer construction and composition. He testified further that cement material found on Speciale's shoes was also present in the valise and on the tools. Another agent testified that the paint samples taken from the photography room doorframe accorded with the paint taken from the sole of Speciale's shoes with respect to color, thickness and texture.

On this appeal defendants argue solely that the taking of their shoes while in custody violated their rights under the Fourth, Fifth and Sixth Amendments of the United States Constitution. We will deal with these contentions in that order.

█ Objections were duly made by defendants to the introduction of the shoes in evidence. These were overruled. No objection was raised by the State at trial to the defendants' failure to move before trial to suppress in accordance with *R. R.* 3:2A–6. Counsel for defendants represents to this court that he did not know before trial that the shoes were to be offered in evidence. Since the State does not dispute this representation, we accept it and deal with the questions raised on their merits.

I

Defendants contend that there was no probable cause for their initial arrest without a warrant and that the taking of their shoes without a search warrant was, therefore, a seizure in contravention of the Fourth Amendment. The position does not withstand analysis.

█ When the shoes were taken the police were in possession of information not known when the defendants were first

apprehended, *viz.,* that burglar tools and heelprints had been found in the area of the grounds and building near which defendants had been detected originally. There was consequently at that time probable cause to believe defendants guilty of the crime for which they were rearrested and convicted. In view thereof the taking of defendants' shoes from them entailed no search but merely the temporary appropriation of articles necessary for further investigation of defendants' suspected implication in the crime. See *State v. Bisaccia,* 45 *N. J.* 504 (1965).

Insofar as the seizure, aside from any search, is separately impugned as the supposed consequence of an illegal arrest, it is necessary to distinguish between the original arrest under *N. J. S.* 2A:170–1 and the later continuation of the detention under the renewed arrest and charge of breaking and entering.

Defendants have not directly assailed the validity of *N. J. S.* 2A:170–1 either in the trial court or here but have cited (without briefing its significance) the decision in *United States v. Margeson,* 259 *F. Supp.* 256, 269 (*E. D. Pa.* 1966), holding the act unconstitutionally vague. That ruling does not bind us. The New Jersey Supreme Court has left that question open in *State v. Salerno,* 27 *N. J.* 289, 296 (1958). We will not decide it here, particularly in the absence of a forthright claim by defendants of unconstitutionality, since we do not find the issue determinative of the appeal.

Assuming, *arguendo,* the invalidity of the original custodial detention, either on the basis of the nullity of *N. J. S.* 2A:170–1 or the absence of probable cause to hold defendants for being "in this state for an unlawful purpose," see *State v. Salerno, supra,* 27 *N. J.,* at *p.* 293, the later "additional arrest" for breaking and entering is unexceptionable although not attended by a warrant since there was adequate probable cause on the basis of the information then possessed by the police, and that arrest is an event sufficiently

discrete from the prior arrest and confinement to insulate the consequent taking of the shoes therefrom.

Neither *Preston v. United States,* 376 *U. S.* 364, 84 *S. Ct.* 88, 11 *L. Ed. 2d* 777 (1964), *Wong Sun v. United States,* 371 *U. S.* 471, 83 *S. Ct.* 407, 9 *L. Ed. 2d* 441 (1963), nor any of several other cases cited by defendants militates to the contrary. They are all distinguishable in that in those cases the incriminatory information which convicted the respective defendants was come by through interrogation or search arising directly from an illegal search or arrest. In the instant case, to the contrary, the original arrest produced no damaging information whatever by interrogation or search. The defendants gave no information. Rather, the incriminatory facts were ascertained in part by the police and others independently of the first arrest and in part from analysis of the shoes which were taken as an incident to the second and lawfully justified arrest. In the language of *Wong Sun, supra,* 371 *U. S.,* at *p.* 488, 83 *S. Ct.,* at *p.* 417, the damning evidence from the shoes, even "granting establishment of the primary illegality" (here, *arguendo,* the arrest under *N. J. S.* 2A:170–1) has not "been come at by exploitation of that illegality" but rather "by means sufficiently distinguishable to be purged of the primary taint."

See also *State v. Hodgson,* 44 *N. J.* 151 (1965) ; *State v. Mark,* 46 *N. J.* 262 (1966) ; *Payne v. United States,* 111 *U. S. App. D. C.* 94, 294 *F. 2d* 723 (*D. C. Cir.* 1961), *certiorari* denied 368 *U. S.* 883, 82 *S. Ct.* 131, 7 *L. Ed. 2d* 83 (1961).

The conviction consequently is not infected with any Fourth Amendment taint.

## II

The objection based on the Fifth Amendment is easily laid to rest. Use of defendants' shoes to unearth incriminating evidence is not a denial of the privilege against self-incrimination as it involves no testimonial compulsion against defendants. *State v. Papitsas,* 80 *N. J. Super.* 420,

426 (*App. Div.* 1963) ; *State v. Cary,* 49 *N. J.* 343 (June 6, 1967), and cases cited therein.

### III

 Defendants contend that the failure of the police to warn them of a right to the advice of counsel before taking their shoes impaired their Sixth Amendment rights under the rationale of *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694 (1966). To this there are several answers. *Miranda* dealt only with safeguards against admissions upon interrogation. Here there were none such. *Miranda* applies only to trials conducted after that case was decided. *Johnson v. State of New Jersey,* 384 *U. S.* 719, 86 *S. Ct.* 1772, 16 *L. Ed. 2d* 882 (1966). This case was tried previously. Finally, the advice of a lawyer would have been fruitless as there was an absolute right on the part of the police in the circumstances to take the shoes for analysis. See *Schmerber v. State of California,* 384 *U. S.* 757, 765–766, 86 *S. Ct.* 1826, 16 *L. Ed. 2d* 908 (1966) ; *United States v. Wade,* 87 *S. Ct.* 1926 (June 12, 1967).

Judgment affirmed.