93 N.J. Super. 586 (1967)
226 A.2d 643
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JACOB BOSCIA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 1966.
Decided February 7, 1967.
*590 Before Judges GOLDMANN, KILKENNY and COLLESTER.
Mr. Jerome A. Vogel argued the cause for appellant (Messrs. Jeffer, Walter & Tierney, attorneys).
Mr. Archibald Kreiger, Assistant Prosecutor, argued the cause for respondent (Mr. John G. Thevos, Passaic County Prosecutor, attorney).
The opinion of the court was delivered by COLLESTER, J.A.D.
Defendant was indicted for the crime of (1) false swearing (N.J.S. 2A:131-4) and (2) bribery (N.J.S. 2A:85-1). The jury found him guilty of false swearing but could not agree upon a verdict on the bribery charge. Defendant appeals.
The false swearing indictment charged that on June 12, 1964 defendant swore falsely in an affidavit given to police officers in the course of an investigation of charges of alleged corruption in the City of Clifton. The material evidence adduced concerning this indictment was as follows:
In March 1963 there was pending before the Clifton planning board an application made by Harvey Cosden on behalf *591 of Cliffwood Terrace Gardens Apartments (Cliffwood Terrace), to change the zoning of certain property to permit the construction of an apartment house thereon.
Arthur Sullivan, a lawyer, who was a member of the planning board, testified that on March 8, 1963 defendant came to his office and sought to persuade him to vote in favor of the zoning change. He said defendant told him that for his favorable vote as a member of the planning board there would be a gift or present "available" in the amount of $1,000. Sullivan said he promptly terminated the interview and that prior to the planning board meeting that evening, he reported the incident to William Holster, the Clifton city manager. He said that about a month later he met Cosden and told him of the bribe offer and that Cosden denied any knowledge of or connection with it. Sullivan testified he also spoke to Allen Smith, a newspaper editor, about the incident, but admitted that other than Holster, Cosden and Smith he told no one about the bribe offer for a period of over 15 months.
Sergeant John De Groot, of the Clifton police department, testified that he had been assigned to investigate alleged corrupt practices in the city government, which were the subject matter of a grand jury investigation. He said he was directed by his superior, Detective Captain Tencza, to question Boscia about his alleged attempt to bribe Sullivan.
On June 12, 1964 defendant met with De Groot at the Clifton detective bureau. De Groot told defendant he was investigating a matter in which Boscia was accused of crime  that he was being accused by Sullivan of having attempted to bribe the city official. He requested Boscia to give him a statement. Defendant asked if he needed a lawyer, and De Groot replied that he didn't think so because the statement would be taken from him only as a witness  that he was not being charged with any crime and was not under arrest.
Defendant thereupon gave a sworn written statement in which he denied the accusation. He denied that he had gone *592 to Sullivan's office in 1963, that he had ever gone there alone, or had talked to Sullivan about the Cliffwood Terrace zoning application. He further denied offering Sullivan $1,000, or any amount of money, if he would change his vote to favor the apartment house project.
On September 23, 1964 Sullivan appeared before the grand jury and testified concerning Boscia's attempted bribe. He specifically denied the material allegations contained in the sworn statement given by Boscia to the police. The false swearing indictment followed.
Defendant did not testify in his own defense at the trial. (He did testify, in the absence of the jury, at a hearing conducted by the trial judge relating to the admissibility of his written statement.) Cosden was called as a defense witness. He testified he had had no business relations with defendant since 1959, and denied having sent Boscia as his emissary to meet with Sullivan. Other than Cosden's testimony, the defense consisted primarily of an attack on Sullivan's credibility by showing his failure to report the bribe offer to law enforcement officials, or to tell other members of the planning board or city officials about it, until many months later.

I
Defendant first contends that the sworn statement he gave the police, on which the false swearing charge was based, was improperly admitted in evidence. He concedes that the statement was voluntarily made. However, he alleges it was inadmissible because it was made at an accusatory stage without benefit of a warning by the police of his right to remain silent and his right to the assistance of counsel during the interrogation.
Defendant relies on Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), which held inadmissible an incriminatory statement by the accused where, after having been taken into custody, the police denied his request for counsel and did not advise him of his right to remain *593 silent during an interrogation designed to obtain a confession.
In Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court clarified its ruling in Escobedo, holding that the procedural safeguards to secure the privilege against self-incrimination are required only where the accused has been taken into custody or otherwise deprived of his freedom of action in any significant way.
The Escobedo rule does not apply in the instant case. It is clear from the record that at the time the statement was requested and given, defendant was not under arrest or in custody. He was told of Sullivan's accusation, that the police were investigating the matter, and asked if he would give a statement. In fact, he was not denied the right to counsel, and it is not disputed that he could have refused to give a statement and would not have been restrained had he left the detective bureau.
Defendant gave the sworn statement voluntarily. It was, of course, a complete denial of Sullivan's version of the attempted bribery. If he voluntarily chose to lie, he could not hide behind the Escobedo doctrine, which applies in an entirely different factual setting.
Moreover, it should be noted that before the prosecutor offered the statement in evidence, defense counsel, in his cross-examination of Sullivan, read aloud Boscia's statement in full, as it appeared in the transcript of the grand jury proceedings. Defendant sustained no prejudice by its subsequent admission in evidence.

II
Defendant next alleges that the court erred in denying a mistrial motion based on a comment in the prosecutor's summation that "the testimony of Mr. Sullivan stands uncontradicted, save and except the false statement of this defendant." He argues that it violated the rule laid down in Griffin v. *594 State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and State v. Lanzo, 44 N.J. 560 (1965), holding that no comment can be made to the jury concerning defendant's failure to take the stand.
The defense offered no testimony to directly contradict that of Sullivan except defendant's sworn statement. Rather, it chose to attack Sullivan's credibility as a witness, primarily because of his delay in reporting the bribe offer to law enforcement officers and others. In our view, what the prosecutor said was fair comment on the evidence. The prosecutor's statement related to Sullivan's testimony and not to Boscia's failure to take the stand.
Defendant also claims it was improper for the court to charge the jury that "he [defendant] does not even have to testify if he does not want to." No objection to this statement in the court's charge was made by defendant. R.R. 3:7-7(b). In the absence of requests to charge and specific objection to the charge as given, defendant may not be heard to complain. State v. Kaufman, 18 N.J. 75, 80 (1955); R.R. 1:5-1(a). Moreover, the trial court clearly charged that the State had the burden to prove defendant's guilt beyond a reasonable doubt. We observe no prejudicial error.

III
We consider next defendant's contention that the trial court erred (1) by permitting the prosecutor, on cross-examination of defense witness Harvey Cosden, to reveal that Cosden had refused to sign a waiver of immunity of self-incrimination when called before the grand jury, and (2) in denying a mistrial motion following the prosecutor's summation in which reference was made thereto.
Cosden, the applicant for the zoning change sought for the Cliffwood Terrace project, testified he had purchased cabinets from Boscia during the period of 1957 to 1959 but had no business dealings with him thereafter. He denied contracting with Boscia for supplies for the Cliffwood Terrace project and said no subcontractor would have been able to bid thereon *595 because complete plans and specifications were never drawn. He said Sullivan had mentioned to him the alleged bribe offer in the summer of 1963, but had refused to say who was involved. He denied he had ever sent Boscia as an emissary to meet with Sullivan.
On cross-examination the prosecutor was allowed, over objection, to bring out that Cosden had refused, on advice of counsel, to sign a waiver of immunity of his constitutional right against self-incrimination when summoned before the grand jury, and as a result did not testify.[1]
In his summation to the jury the prosecutor said it could infer from the facts that Boscia was Cosden's emissary  that while Cosden protested his innocence, when he was called before the grand jury he "sheltered himself with the immunity of the Constitution and refused to testify."[2]
*596 Defendant argues that Cosden's exercise of his constitutional right against self-incrimination when subpoenaed before the grand jury could not be shown to impeach Cosden's credibility as a witness at the trial, and that such evidence raised an improper inference of defendant's guilt. The State contends such evidence was proper to show that Cosden's prior refusal to testify without immunity was inconsistent with his willingness to testify at the trial  that such inconsistency could be pointed out to attack Cosden's credibility. It further argues that Cosden's assertion of the privilege against self-incrimination before the grand jury did not raise an inference of Boscia's guilt at the trial.
In Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), it was held that the trial court, in the exercise of its sound discretion, should have refused to permit the prosecution to cross-examine a defendant as to his assertion of the privilege against self-incrimination before the grand jury, where the probative value on the issue of defendant's credibility was so negligible as to be far outweighed by its possible impermissible impact on the trial *597 jury as to implications of guilt to be drawn from the assertion of the privilege. The court held that no implication of guilt could be drawn from defendant's invocation of the privilege before the grand jury  that one of the basic functions of the privilege is to protect innocent men. The court stated:
"Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege." (353 U.S., at p. 421, 77 S.Ct., at p. 982, 1 L.Ed.2d, at p. 952)
In the concurring opinion of four of the Justices, written by Justice Black, the court stated it could think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The court said:
"The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them. It seems peculiarly incongruous and indefensible for courts which exist and act only under the *598 Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution." (Ibid. 353 U.S., at p. 425, 77 S.Ct., at p. 984, 1 L.Ed.2d, at p. 955)
In United States v. Tomaiolo, 249 F.2d 683 (2 Cir. 1957), in a situation analogous to the instant case, the prosecution sought to impeach the testimony of a defense witness by showing that the witness had claimed the privilege against self-incrimination before the grand jury but had testified freely at the trial. Citing Grunewald v. United States, supra, the court held that under the circumstances of the case such cross-examination of the witness should have been excluded because the probative value on the issue of credibility was so negligible as to be far outweighed by its possible impermissible impact on the jury.
The State places reliance on United States v. Sing Kee, 250 F.2d 236 (2 Cir. 1957), certiorari denied 355 U.S. 954, 78 S.Ct. 538, 2 L.Ed.2d 530 (1958); People v. Ashby, 8 N.Y.2d 238, 203 N.Y.S.2d 854, 168 N.E.2d 672 (1960), and Goswick v. State, 137 So.2d 863 (Fla. D. Ct. App. 1962), reversed on other grounds 143 So.2d 817 (Fla. Sup. Ct. 1962). We are satisfied that both Sing Kee and Ashby are distinguishable.
In United States v. Sing Kee, supra, defendant on direct examination of a defense witness sought to show that the witness's testimony at the trial was substantially the same as given prior thereto before the grand jury  thereby bolstering his credibility. The trial court permitted the Government to show on cross-examination that the witness had claimed the Fifth Amendment privilege not to answer certain questions when he was before the grand jury. The Second Circuit held that having brought the conduct of the witness before the grand jury in issue, defendant could not complain that the Government was permitted to develop all that happened so as to rebut an inference which was contrary to fact. The court also stated that the crucial question was whether the jury would be likely to equate the refusal of the witness to answer *599 questions before the grand jury with defendant's guilt  that if the danger that the jury's knowledge of the prior plea of privilege might have been improperly carried over so as to affect its belief in defendant's innocence or guilt outweighed the effect on credibility, then evidence of the prior plea should be excluded. It held that, unlike the facts in United States v. Tomaiolo, supra, the questions which the witness had refused to answer before the grand jury were not so intimately related to the details of the crime that the trial jury would be likely to infer facts directly bearing on defendant's participation in the crime charged.
The facts in People v. Ashby, supra, are similar to those in United States v. Sing Kee, supra, upon which the court relied. One Barieka had been subpoenaed to testify by the prosecution but was not called as a State's witness. Defendant then called Barieka as a witness and endeavored to show that he had been a willing witness, ready to testify fully, but had been precluded by the prosecutor. In this setting, the prosecutor was permitted to reveal on cross-examination of the witness that when questioned prior to trial by the State Commissioner of Investigations about the matters testified to at the trial, Barieka had "some forty or fifty or sixty times" refused to answer on the ground that his answers would tend to incriminate him. The court held that the prosecutor had a right under the circumstances to show that Barieka was no willing witness, eager to tell the whole truth and was not thwarted by the tactics of the prosecution. The court stated that the issue of Barieka's alleged willingness to talk and the prosecutor's refusal to let him had been put prominently into the case by the defense and the issue had to be presented fully to the jury  that defendant had opened the door to the inquiry and the prosecution had moved in.
Goswick v. State, supra, supports the State's position. There, one Eldredge, who apparently witnessed an aggravated assault committed by his employer, the defendant, testified as a defense witness. The prosecutor, in an attempt to impeach his testimony, brought out on cross-examination that the *600 witness had previously invoked his constitutional privilege against self-incrimination at a time when he was subpoenaed before the state's attorney. The court cited United States v. Sing Kee, supra, and apparently decided that the jury would not be likely to equate Eldredge's refusal to testify before the state's attorney with defendant's guilt. The court stated that the requirement of the public that truth be displayed at criminal trials outweighed the right of a witness not to have it known that he had used the Fifth Amendment as a reason for failing to testify.
We cannot agree with the broad statement made by the court in Goswick. We think the correct principles of law relating to the impeachment of a witness by revealing to the trial jury his prior reliance on his constitutional right against self-incrimination are set forth in United States v. Tomaiolo, supra, which in turn were based on the principles set forth in Grunewald v. United States, supra. See also People v. Luckman, 254 App. Div. 694, 3 N.Y.S.2d 864 (App. Div. 1938) and the cases cited therein, and People v. Boulahanis, 394 Ill. 255, 68 N.E.2d 467, 471 (Sup. Ct. 1946).
Insofar as Cosden's prior refusal to waive immunity is asserted to be inconsistent with his subsequent testimony at the trial it seems to us that, in the circumstances of this case, there was no real inconsistency. Cosden was summoned before the grand jury on the same date that Sullivan appeared and testified. He had been told by Sullivan that a bribe offer had been made to obtain Sullivan's favorable vote for the change of zone which he had sought. His attorney had advised him not to sign a waiver of immunity against self-incrimination. He had every reason to believe that he might be charged with complicity in a crime himself. Under such circumstances it was perfectly consistent with innocence to refuse to waive his immunity against self-incrimination. United States v. Tomaiolo, supra, 249 F.2d, at p. 691; Grunewald v. United States, supra, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d, at p. 953. Thus, we conclude that Cosden's fear of incrimination before the grand jury was quite understandable *601 and that his non-incriminatory testimony at the trial was not inconsistent with his refusal to waive immunity before the grand jury.
On the other hand, the introduction of such evidence was bound to affect adversely Cosden's credibility as a witness. Unquestionably, the jury was led to believe that he had claimed his constitutional privilege before the grand jury because he was in some manner involved in the bribe attempt, for that is the almost inevitable result of the claim against self-incrimination. We hold that in the particular circumstances of this case such cross-examination should have been excluded because the probative value on the issue of credibility was so negligible as to be far outweighed by its possible impermissible impact on the jury, especially in view of the importance of this witness to the defense.
As noted above, defendant did not take the stand on his own behalf. However, in his sworn statement, which was the basis of the false swearing indictment, he denied going to Sullivan's office, discussing the zoning matter, and offering a bribe. Other than Cosden's testimony, his defense was an attack on Sullivan's credibility, primarily by showing Sullivan's long delay in reporting the bribe offer to law enforcement officials and his failure to mention it to other members of the planning board and municipal council.
Cosden was obviously the most important witness called by defendant. He was the person who, according to the State's theory, allegedly sent defendant as his emissary to Sullivan's office to make the bribe offer. His testimony was offered to support defendant's defense that he never went to Sullivan's office, and that there was no motive or reason therefor because he had nothing to gain by such a venture.
We believe that the jury could readily have equated Cosden's refusal to testify before the grand jury without immunity from self-incrimination with defendant's guilt and therefore defendant suffered prejudicial error by the admission of such evidence. The prejudice was further aggravated by the prosecutor's comment in summation that the defense *602 sought to contradict the State's case by calling as a witness Harvey Cosden, "who clothed himself in the constitutional immunity."

IV
Defendant also claims the court erred in permitting cross-examination of defense witness Stephen Goceljak concerning statements made to him by one John Feczer, out of the presence of defendant.
Goceljak, a member of the planning board, testified on direct examination that Sullivan never spoke to him about the bribe offer. (It is undisputed that Sullivan did not do so.) On cross-examination, over defendant's objection, the prosecutor was permitted to bring out that Feczer, another member of the planning board, had told Goceljak that a substantial amount of money had been paid to "somebody" on the "Cosden matter." Moreover, the prosecutor was permitted to question Goceljak concerning the testimony he gave before the grand jury regarding Feczer's statements.
Defendant argues that such testimony was highly inflammatory and prejudicial because it concerned alleged payoffs to obtain zoning approval for the Cliffwood Terrace project  for which he was charged with having made a bribe offer to Sullivan. He charges that such cross-examination was improper because it exceeded the scope of Goceljak's direct examination, and that it was not undertaken to impeach Goceljak's credibility as a witness. He alleges that the sole purpose of such testimony was to persuade the jury that some misdeeds must have taken place to secure approval of Cosden's application and consequently defendant must have been involved in the bribe attempt.
The State contends that the cross-examination was proper and the evidence revealed thereby was admissible. It argues that it could reasonably be inferred that a conspiracy existed among Cosden, William Sellinger (a councilman who intervened with Sullivan to look favorably upon the Cosden application) and defendant, so that anything that related to *603 furtherance of the conspiracy was admissible and it was not necessary that the charge against defendant be one for conspiracy, citing State v. Carbone, 10 N.J. 329 (1952). The State also argues that where several crimes are so connected that they form a single criminal transaction, and a complete account of any of them cannot be given without showing the other, any or all are admissible in evidence against a defendant on trial for any offense which is itself part of the whole criminal scheme, citing State v. Raymond, 53 N.J.L. 260 (Sup. Ct. 1891), followed in State v. Lanzo, supra. And finally, the State urges as a further alternative to support the action of the trial court, that the statements made by Feczer to Goceljak were properly admitted because it was a spontaneous utterance, and although hearsay, was part of the res gestae.
We do not agree that the facts of this case support the State's contentions. The testimony drawn from Goceljak on cross-examination not only exceeded the scope of the direct examination but was not adduced to impeach the credibility of the witness. It was obviously inadmissible hearsay. (It is to be noted that neither side called Feczer to testify as a witness.)
Nothing contained in the hearsay testimony related to the indictments against defendant. Moreover, the Feczer statements did not relate to acts or declarations of Cosden, Sellinger or defendant, who the State now alleges were engaged in a criminal conspiracy; nor did they relate to a common plan or scheme. Feczer did not mention defendant in his discussions with Goceljak.
The admission of such testimony was error. It was further compounded when the prosecutor, during his cross-examination, read to the jury Goceljak's grand jury testimony concerning Feczer's remarks. The State concedes there was no contradiction between Goceljak's grand jury testimony and that which the prosecutor had elicited on cross-examination. Unquestionably the prosecutor's action was to bolster and lend emphasis to the testimony he had developed *604 on cross-examination. This was improper. Prior consistent statements of a witness made before the grand jury are inadmissible for such a purpose. Cf. State v. Sullivan, 24 N.J. 18, 39 (1957); State v. D'Ippolito, 19 N.J. 540, 550-551 (1955), and see 4 Wigmore, Evidence (3d ed. 1940) § 1124, p. 194.
The State argues that if the evidence was improperly admitted it was harmless error because it referred only to the bribe offer mentioned in both indictments  that since the jury did not reach an agreement upon the bribery indictment, defendant was not prejudiced.
We cannot agree. The inadmissible evidence which resulted from Goceljak's cross-examination may very well have influenced the jury's thinking on the false swearing charge  it had that potential.
The trial errors, to which we have referred, unquestionably created an atmosphere which was highly prejudicial to the defendant. The sound administration of justice requires that the accused, no matter how seemingly evident, his guilt, be given a fair trial surrounded by substantive and procedural safeguards. Where the legal errors are of such magnitude as to prejudice the defendant's rights, or in their aggregate have rendered the trial unfair, a new trial should be granted. State v. Orecchio, 16 N.J. 125, 129 (1954); State v. Hunt, 25 N.J. 514, 520 (1958); State v. Mack, 86 N.J. Super. 594, 598 (App. Div. 1965).
We are convinced that the trial errors, referred to above, possessed a clear capacity to preclude defendant from a fair trial.
The judgment of conviction is reversed and the case will be remanded for a new trial.
NOTES
[1] The testimony of Harvey Cosden before the grand jury on September 23, 1964 was:

"Q. Do you understand what your rights as a witness are under the Constitution of the United States and under the State of New Jersey?
A. Yes.
Q. Have you had occasion to consult with an attorney following your subpoena before the Grand Jury?
A. Yes.
Q. Do you understand you have certain protection against self-incrimination?
A. Yes.
Q. Do you understand also that you can waive the privileges against self-incrimination?
A. Yes.
Q. If you do so waive your privilege, this Grand Jury on the basis of your own testimony can indict you if they feel that this is a proper thing to do. Do you understand that?
A. Yes.
Q. I am going to ask you to sign a written waiver of your rights and privileges against self-incrimination. Will you sign such a waiver?
A. No.
Q. No further questions. You may be excused."
[2] Excerpts from the Prosecutor's summation to the jury:

"Here we have the groundwork. You see it; you sense it; you feel it. Did Cosden send Boscia as his emissary? Boscia comes a month or six weeks later. He comes on March 8, 1963 to the office of Arthur Sullivan. Cosden first, Boscia second. Did they not have prior business relations with one another? Is it not admitted in the statement? Was there no relationship between them? That is an inference that you may draw from the facts in this case.
And why did Boscia go there? What was his intention and what was his motive? The hand of bribery stretched forth to clasp the hand of Sullivan. But the hand of bribery was spurned, the offer, the inducement of $1,000.
* * * * * * * *
What was another incident as we see the picture in its entirety? Sullivan is accosted by Harvey Cosden in a parking lot outside of the Montauk Theatre, and Sullivan let Cosden know where he stood again. And he said in plain blunt terms: Did you send Boscia to see me? The Boscia intercession was mentioned. What does Cosden say? Cosden the witness for Boscia. Oh, the protest of innocence of Harvey Cosden. Harvey Cosden, whom you saw on the witness stand and what a miserable witness. A business associate on former matters with Boscia. And when Cosden was confronted with the fact that he was called before the Grand Jury on this probe Cosden, Boscia's witness, admitted he sheltered himself with the immunity of the Constitution and refused to testify. You see the picture?
* * * * * * * *
Well, at this time the matter was still pending with Boscia looking for a reward of some contracting. These are matters for your consideration.
* * * * * * * *
Now, ladies and gentlemen, is it not clear, is it not apparent that Boscia was the emissary of someone that was interested in this garden apartment? Does not the pattern begin to unfold? Cosden going to Sullivan's office followed a month or six weeks later by Boscia. Boscia in his office the morning of which the application would be considered that evening. Were these mere fortuitous circumstances that brought Boscia to Sullivan's office? Was Boscia an ambassador of good will or did he have other purposes in going there?
* * * * * * * *
What has the defense presented in this case? An attempt to destroy Arthur Sullivan. If it cannot destroy the story, destroy the man. And you saw the evidence that was presented by the defense. And how do they contradict and destroy it, the State's case in this matter? They brought Harvey Cosden in who clothed himself in the constitutional immunity."