97 N.J. Super. 573 (1967)
235 A.2d 684
STATE OF NEW JERSEY
v.
JAMES WILLIAMS, DEFENDANT.
Superior Court of New Jersey, Bergen County Court, Law Division.
Decided October 23, 1967.
*580 Mr. Fred C. Galda, First Assistant Prosecutor, for the State (Mr. Guy W. Calissi, County Prosecutor, attorney).
Mr. Donald R. Conway, assigned counsel, for defendant.
KOLE, J.C.C.
Defendant James Williams was indicted for the following offenses: murder of Susan Schweikart; rape of Susan Schweikart and Tauba Zintz; robbery of Susan Schweikart and Tauba Zintz, and atrocious assault and battery against Tauba Zintz. All of these offenses, according to the indictments, took place on June 16, 1967.
Defendant moved to suppress the following items of evidence: a pair of black pants, a green knit shirt, a pair of blue socks, a pair of sneakers, a small pen knife, a black comb, a black wallet containing 14 miscellaneous papers and cards and 5 photographs, $91.55 in United States currency, a speed deposit plate in the name of Tauba Zintz  No. 301-02208-9, and a Stern's charge plate in the name of Tauba Zintz, 253 Park Street, Hackensack, New Jersey.
At the hearing on the motion the following persons testified on behalf of the State: Lieutenant Iurato, Captain Morosco, Detective Williams, all members of the Hackensack Police Department, and Lieutenant Graber of the Bergen County Prosecutor's Office. Defendant did not testify but presented Lieutenant Hardy of the Hackensack Police Department, now, however, in retirement, as his witness.
From the evidence on the motion I find the facts to be as follows:
During the night of June 15, 1967, or shortly after midnight on June 16, 1967, the Hackensack Police Department was notified that two women, Susan Schweikart and Tauba Zintz, residing at 253 Park Street, Hackensack, New Jersey, had been raped and robbed. At or about 12:55 A.M. on June 16, 1967 Lieutenant Hardy and Detective Leggiere went to *581 the scene of the crime and Hardy spoke to both victims, obtaining from them a description of the alleged offender.
He then notified the prosecutor's office and the other Hackensack police authorities of the crime and the information he had obtained and went to the Hackensack Hospital, to which the victims had been removed. At the hospital he spoke with Susan Schweikart and Tauba Zintz. The conversation with Tauba Zintz took place between 2:30 and 3:00 A.M. Thereafter, he went back to the scene of the crime, made a search thereof, and returned to police headquarters a little before 8 A.M., where he spoke to Captain Morosco, Lieutenant Iurato and Detective Williams, and also Detectives Allmers and Fallon and Lieutenant Graber of the prosecutor's office, who were there present. Captain Morosco was in charge of the investigation on behalf of the Hackensack police.
Both victims were alive after the attack and, as stated, were taken to Hackensack Hospital shortly after the attack was reported. Subsequently one of the victims, Susan Schweikart, died, apparently of the injuries she received.
After the victims had been removed to the hospital and the crime had been reported to the Hackensack Police Department and the Prosecutor, they were visited in the hospital by several detectives, including, as indicated, Lieutenant Hardy.
From about 4 A.M. June 16, 1967 until shortly before 8 A.M. Captain Morosco and other law enforcement officers were considering various persons who might fit the description given by the victims. Shortly before 8 A.M. the same day, a meeting was held at Hackensack Police Headquarters. Present were Captain Morosco, Lieutenant Iurato, Detective Leggiere, Detective Williams and Lieutenant Hardy of the Hackensack Police Department, and Detective Allmers and Lieutenant Graber of the Prosecutor's office. From the interviews with the two victims and discussions among the police enforcement officers at and before the meeting, a description of the perpetrator of the offenses emerged. He was described *582 as a tall, good-looking negro male with a gentlemanly way of speaking, wearing a polo shirt, and of medium build. The general aspects of the crime and possible suspects fitting the description were also then reviewed and discussed at the meeting. Six to eight possible suspects'[1] names emerged as being potentially fruitful leads, because they generally fitted the description, including Mark L. Smith, Robert Hill, Donald Akridge, Jessie Bonds and James Williams, the defendant herein. The police then also were made aware of the fact that a red wallet had been taken from the victims containing 2 credit or identification cards and about $100 in cash. No arrest or search warrant was issued with respect to any of the possible suspects.
Captain Morosco assigned various detectives to check out or find and bring back to the station each of the various possible suspects discussed and agreed upon. Two suspects, Akridge and Hill, were immediately eliminated from investigation, since one had been living for some time in Philadelphia and another turned out to be 5' 4", the attacker having been described as "tall". Captain Morosco assigned Detectives Hardy and Williams to pick up the defendant and bring him back to headquarters as a possible suspect, since he was one of those who fitted the description of the possible assailant.
Hardy and Williams first went to defendant's home in Hackensack but his parents informed them that he had not been home for two to three weeks and that the parents had seen defendant sleeping in a car with another man the night before. Knowing that defendant frequented a bar known as the 72 Club in Hackensack and having also heard *583 that defendant had been reported to be spending money freely, Lieutenant Hardy and Detective Williams then went to the 72 Club where, some time soon after 8 A.M. on June 16, 1967 defendant was found. Lieutenant Hardy stayed outside while Detective Williams went into the Club. Detective Williams approached the defendant and asked him to come down to Headquarters because he wanted to talk to him. Defendant at first did not want to go. He asked Detective Williams, "Are you going to lock me up?" and when the detective answered, "No, you are not under arrest, I only want to talk to you", he went with the detective. Defendant had been drinking but was not drunk; neither were his faculties in any way impaired.
Defendant went out of the Club with Detective Williams into the street where Lieutenant Hardy was waiting. Both Lieutenant Hardy and Detective Williams testified, and I so find, that at that time defendant was free to go at any time, Lieutenant Hardy saying that if defendant had walked away he would have called him back but would not have attempted physically to detain him.
Both Lieutenant Hardy and Detective Williams were of the view that defendant generally fit the description given to them and, in addition, saw that he had brown stains on his polo shirt, the color of which shirt might have corresponded to that of the person described as the perpetrator of the crimes. Detective Williams believed these to be blood stains; Lieutenant Hardy thought they could be blood stains but was not sure. Both Lieutenant Hardy and Detective Williams rode back to Police Headquarters with defendant, Detective Williams driving and Lieutenant Hardy sitting in the back with the defendant. Defendant voluntarily entered the police car without balking or fussing. Detective Williams said nothing to the defendant during the ride back to Headquarters but Lieutenant Hardy asked him where he had been the night before, in view of the information which he had received from the defendant's parents that he had not been seen for about 2 to 3 weeks. Defendant *584 said that he had slept in a car the night before. Both Lieutenant Hardy and Detective Williams testified, and I find as a fact, that defendant could have voluntarily left their presence from the moment he was met at the 72 Club to the moment that he entered Police Headquarters.
The defendant was brought to the Detective Room of Hackensack Police Headquarters by the two detectives for questioning. This was a large room in which all possible suspects are interviewed with respect to any crime. He was brought into Headquarters at about 8:30 A.M. on June 16, 1967 and a discussion took place among him, Lieutenant Graber of the Prosecutor's Office, and Lieutenant Iurato of the Hackensack Police Department, for about 5 or 10 minutes. Lieutenant Iurato, who had known defendant since defendant was a baby, and lived two blocks from him, questioned defendant. He asked defendant about his actions or whereabouts during the night of the crimes but he did this, he testified, and I so find, not because defendant was then a real suspect to him but merely because he knew the defendant as a friend. Defendant sat near a desk. Lieutenant Graber of the Prosecutor's Office asked the defendant to empty his pockets and whether he had any money on him. Defendant thereupon put 55¢ in change on the desk. Graber asked whether he had any more and defendant said, "I have" and then put $12 on the desk. He then drew a black wallet from his pocket and rather petulantly threw it on the desk, stating, "Don't touch it. It's my mother's." When the defendant so threw the wallet, the force of the throw caused the deposit plate and the charge plate, on which Tauba Zintz' name appeared, and which are among the items sought to be suppressed, to fall out therefrom on the desk.[2] At this point Captain Morosco, who was in *585 charge of the investigation for the Hackensack Police Department, stated "hold it" and Lieutenant Graber formally placed defendant under arrest for the crimes involved and simultaneously advised defendant of his constitutional rights  to remain silent, the right to have an attorney, and all of the other rights which are required by Miranda. The arrest took place about 10 minutes after defendant's arrival at Police Headquarters. After the arrest the evidence sought to be suppressed by this motion was taken from the defendant by the Prosecutor's Office.
As stated, the law enforcement officers were actually looking for a red wallet which they believed contained the approximately $100, as well as the deposit plate and charge plate, which had been taken from the victims. None of the enforcement officers was aware of what the black wallet contained until defendant's throw caused the two plates to fall therefrom; nor did any of them ask defendant to produce, or whether he had, any wallet whatsoever.
Prior to the arrest, Lieutenant Graber also asked defendant where he had been the night before. He told Graber that he had been at the 72 Club and at Leon's, also located in Hackensack. Lieutenant Graber also asked defendant, as indicated, to empty his pockets, not only to determine whether defendant had any unusual amount of money, but also basically to determine whether defendant was carrying a concealed weapon. Lieutenant Graber had heard from the Hackensack police that defendant had a past history of violence and Lieutenant Hardy and Detective Williams had informed Graber that they had not searched the defendant before bringing him to Headquarters.
After the arrest, Lieutenant Hardy and Detective Williams were dispatched to the 72 Club again to see whether they could find the red wallet and they also searched Pete Baker's car, the place where defendant told Lieutenant Hardy he had slept the night before. There is nothing in the evidence to indicate that any of the items sought to be suppressed were found during this last search.
*586 During all the questioning there were a number of detectives milling around the room, apparently all of them armed.
A period of approximately 5 to 10 minutes elapsed between the time that defendant entered the Detective Room at Headquarters and the time that he was formally arrested. Captain Morosco and Lieutenant Graber testified, and from their testimony and that of some of the other law enforcement officers present, including my inference from such testimony as to defendant's cooperative, though somewhat sullen, behavior during his short stay in Police Headquarters, I find that, even at such Headquarters, defendant was free to leave at any time and was not in custody or under arrest until he was formally arrested.
In short, I find that defendant could have voluntarily left the presence of the police from the moment he met Detective Williams at the 72 Club until the moment of his formal arrest by Lieutenant Graber of the Prosecutor's Office, and until the latter moment he was not in custody, under any restraint, or under arrest.
Defendant never denied or admitted his implication in the crimes involved herein or any other crimes prior to being placed under arrest. Only after he was placed under arrest did he deny guilt of the crimes charged.
At the conclusion of the hearing on the motion, I denied it for reasons given orally in open court and stated that the reasons and findings would be supplemented by this written opinion.

CLAIMED VIOLATION OF THE FOURTH AMENDMENT
Defendant contends that the search and seizure of the items sought to be suppressed violated his Fourth Amendment rights against unreasonable search and seizure. The claim is that he was arrested without a warrant and without probable cause and, therefore, the search and seizure of these items, without a warrant and not being incidental to a *587 valid arrest, were illegal; and that, since about 4 1/2 hours prior to his being spoken to at the 72 Club, the police considered him a suspect, a warrant should have been obtained for his arrest. Defendant further contends that the absence of probable cause to arrest him and search him incidentally to that arrest continued up to the time the deposit plate and charge plate fell out of his wallet, thus making his search at the Hackensack Headquarters Detective Bureau an illegal exploratory search for incriminating evidence within the rule of State v. Hutchins, 43 N.J. 85 (1964) and discussed in State v. Contursi, 44 N.J. 422, 433 (1965).
A police officer may arrest without a warrant if he has reasonable grounds or probable cause for believing a felony, such as murder, had been committed, even though the felony had not been committed in his presence. State v. Smith, 37 N.J. 481, 493 (1962). As incidental to a valid arrest, the arresting officer may conduct a search without a warrant of the person of the individual arrested and the immediate surroundings under his control. State v. Doyle, 42 N.J. 334 (1965); State v. Scanlon, 84 N.J. Super. 427, 434, 435 (App. Div. 1964). But not every search made without a search warrant and not incidental to a lawful arrest, is an "unreasonable" search within the meaning of the Fourth Amendment. A search incidental to arrest "does not exhaust the subject of reasonable searches without a warrant. Rather it represents merely a category of reasonable searches." State v. Boykins, 50 N.J. 73, 78 (1967). See also, State v. Dilley, 49 N.J. 460 (1967) for a discussion of permissible search incidental to a detention situation not amounting to an arrest. The Fourth Amendment, in its practical application, demands a "continuing reconciliation of competing values" among which are the right of the citizen to live free of criminal attack, the necessity of efficient police work and the right of a suspect to be secure against arbitrary and oppressive police practices. Boykins, supra, 50 N.J., at p. 81; State v. Davis, 50 N.J. 16, 22-25 (1967). It is of paramount importance that in this reconciliation *588 process, the "practical demands of effective criminal investigation and law enforcement" be effected through "workable rules" and "practical, non-technical" conceptions, keeping constantly in mind that the exclusionary rule is a product of the judiciary and not the Fourth Amendment itself. The exclusionary rule, which supports the right of a suspect to be secure against arbitrary and oppressive police practices, is just one in the "galaxy of values" that the Fourth Amendment through the juriciary must protect. Davis, supra. As Chief Justice Weintraub said in Davis (at p. 23):
"* * * unless we can assume that offenders set free by suppression of patent proof of their guilt will not resume a criminal course, we must recognize that the pain of the sanction of suppression will be felt, not by some abstraction called the `police' or `society' but by tomorrow's victims, by the innocent who more likely than not will be the poor, the most exposed and the least protected among us. Nor can we fail to note that while the sanction supports the high value inherent in freedom from unwarranted search, yet in another aspect it works against public morality because the suppression of the truth must tend to breed contempt for * * * the law. Such are the stakes, and it is in their light that the unreasonableness of a search must be measured."

I
There is no objective test extant for determining when an arrest occurs. Rather, the action of the arresting officers must be evaluated in the context of all the facts and circumstances of the particular case. State v. Bell, 89 N.J. Super. 437, 443 (App. Div. 1965); State v. Romeo, 43 N.J. 188, 205 (1964). The one criterion of arrest which appears to have been agreed upon is the necessity of some restraint of the person of the suspect with some accompanying restriction of his freedom of movement. Hutchins, supra; State v. Ferraro, 81 N.J. Super. 213, 216-217 (Cty. Ct. 1963); State v. Harbatuk, 95 N.J. Super. 54, 60 (App. Div. 1967); State v. Doyle, 42 N.J. 334, 342 (1964). An arrest can also occur when a suspect is confronted with some tangible assertion of police authority, not amounting *589 to physical restraint, but as a result of which a strong apprehension of restraint is reasonably aroused in the suspect's mind. This situation is the troublesome one, involving, as it does, a determination of the states of mind of the arresting officer and the suspect. In State v. Mark, 46 N.J. 262, 270 (1966) where the officer, in defendant's presence, found incriminatory evidence pointing toward the defendant as the culprit, and subsequently the officer testified that he would not have, after finding the evidence, let the defendant out of his custody had the defendant attempted to flee, the court found the arrest to be effected concomitantly with the officer's formation of this state of mind. See also. Harbatuk, supra.
In the present case, however, the uncontradicted testimony of Lieutenant Hardy and Detective Williams, the officers who brought defendant from the 72 Club, and Captain Morosco, the man in charge of the investigation and present in the Detective Bureau from the time the defendant was brought in to the time he was formally arrested, affirmatively established, and I so find, that the defendant was free and knew he was free to leave at any time. He was specificaly told he was not under arrest and was not being "locked up", implying that he was not to be charged with any crime.
The defendant, of course, might contend that it would be highly unreasonable for him to consider himself as anything but arrested when approached by Detective Williams at the 72 Club  that when the police approach an individual under the described circumstances, he cannot help but feel the restraining authority of law enforcement officials. But no proof of this state of mind was adduced. The defendant did not testify as to his state of mind, and the evidence taken as a whole, "tends to negative any such state of mind on the part of the defendant." See United States v. Knight, 261 F. Supp. 843, 844 (E.D. Penn. 1966).
A further answer to any such contention is that a person may feel detained or actually be detained and yet *590 not be arrested in the legal sense at all. Not every detention amounts to an arrest. An officer may stop and question an individual he observes acting suspiciously or whom he observes in a situation suggestive of a criminal violation. State v. Hope, 85 N.J. Super. 551, 554 (App. Div. 1964); State v. Dilley, 49 N.J. 460, 467 (1967); State v. Bell, 89 N.J. Super. 437, 443 (App. Div. 1965). And this temporary detention for the purposes of summary inquiry does not require the probable cause needed for arrest.
In the present case, it is true that defendant was not observed in suspicious circumstances. He was drinking at a local bar. But it could not seriously be contended that the knowledge required to form a suspicion for the purpose of summary inquiry must be the result of the personal observations of the officers picking up the alleged suspect for questioning. In the present case, the suspicion which prompted Lieutenant Hardy and Detective Williams to pick up the defendant was communally aroused at an early morning meeting and discussion of the police officers assigned to the case under Captain Morosco. From six to eight names fitting the eyewitness description of the assailant given by the victims were decided upon, after discussion among the police involved, as potentially fruitful leads. From the names exchanged at the group meeting the defendant's name emerged as one of many possible suspects, and it was on the basis of this kind of suspicion that Lieutenant Hardy and Detective Williams were directed to look for the defendant. Cf. State v. Fioravanti, 46 N.J. 109, 122 (1965). Because, at the time of the meeting, the investigation was unfocused and amorphous, and because at that time there existed in the police officers' minds no more than bare suspicions as to possible assailants, it would have been futile to require them to procure an arrest or search warrant, as the defendant contended they should have. An arrest or search warrant, like an arrest without a warrant, must be grounded on probable cause (State v. Sheppard, 46 N.J. 526 (1967)), and no probable cause existed *591 for the issuance of any such warrant until the two incriminating plates appeared on the Detective Bureau desk by reason of defendant's own voluntary action. Thus, here, the circumstances under which defendant was questioned and which produced the evidence sought to be suppressed did not constitute an arrest, but rather involved a temporary detention for the purposes only of summary inquiry by the police to determine whether defendant should be considered a suspect warranting further investigation with respect to these crimes.
In White v. United States, 222 A.2d 843 (D.C. Ct. App. 1966), the court held that the police may question an individual observed in suspicious circumstances, in order to verify his explanation of those circumstances. That the suspect was driven in a police car in the course of verifying his story, especially when it was proved he entered the car voluntarily, was found by the court to be no indication of arrest. Similarly, in the present case, the defendant, one of a number of suspects, voluntarily entered the police car for the short ride to the Detective Bureau, a facility in which all suspects were interviewed by the Hackensack police on both focused and non-focused investigations. It would be unreasonable to require the detectives to speak to the defendant in the atmosphere of the 72 Club bar or on the street immediately outside, when the Detective Bureau was so readily accessible by car and routinely used for questioning purposes. The police-suspect relationship in this case, in light of the testimony and the total "facts and circumstances," (Bell, Romeo, supra), which I have heretofore found, did not, merely because of the intervening instrumentality of the police car, become one of arrest, particularly where, as here, defendant was always free to leave the police who picked him up.
Nor was defendant under constructive or actual arrest merely because he was in the confines of the Hackensack Detective Headquarters. The fact that the suspect is on police property is only one factor bearing on the question *592 of whether he is under arrest. The location of the temporary detention is by no means a conclusive factor. State v. Boscia, 93 N.J. Super. 586, 593 (App. Div. 1967), although a Fifth Amendment case, involved, like the present case, a situation in which the defendant claimed that his self-incriminating evidence was extracted from him while in custody at the Detective Bureau. Based on the testimony of the detectives that Boscia was under no compulsion to talk and was free to go at any time, the Court found that Boscia's presence in the Detective Bureau was not under color of arrest. Here, the defendant claims aggrievement under the Fourth Amendment, contending that the articles sought to be suppressed were extracted from him while in police custody. But here, as in Boscia, I have already found that defendant was under no restraint and was free to leave the Hackensack Detective Headquarters, at least until he was formally arrested. Prior to the formal arrest he was under neither constructive nor actual arrest while at Headquarters. He was being detained temporarily solely for the purposes of summary inquiry. There was no arrest and, with respect to the $12.55 and the deposit and credit plates thrown on the desk, no search or seizure thereof, until after defendant's formal arrest, which, as hereafter stated, was based on probable cause. Thereafter, the money, deposit and credit plates and the other items of evidence sought to be suppressed were taken as incidental to a lawful arrest and were validly seized. See III, infra.
Nor does Lieutenant Graber's request that defendant empty his pockets, to make sure that he had no concealed weapons, change this conclusion. Such a request was entirely reasonable during the investigatory detention phase to protect the police. State v. Dilley, supra, 49 N.J., at p. 469. That there were a number of armed officers in the room does not mean that defendant was incapable of possessing or using a concealed weapon against one or more of them, particularly since he had not been searched prior thereto by either of the detectives who had brought him into *593 police headquarters and Lieutenant Graber had heard that defendant had a past history of violence.
The defendant's motion to suppress the evidence he claims was illegally seized from him in violation of the Fourth Amendment while in police headquarters and thereafter may be denied solely on the foregoing grounds. The treatment of the defendant by the detectives was at every juncture non-compulsory, summary and non-custodial, with the total time, from the 72 Club to formal arrest consuming less than 45 minutes, with the majority of time taken up by the subordinate matters of talking in the 72 Club, walking from the 72 Club to the car, driving in the car to the Detective Bureau, and entering the police station. The actual length of time from the appearance of defendant at the police station to formal verbal arrest was, at the most, 10 minutes. This was truly expeditious investigatory police work, clearly permissible as an adjunct to any reasonable and routine criminal investigation of possible suspects. Cf. Davis, Dilley, supra.

II
There is a further ground upon which defendant's claim may be denied. The search which defendant contends violated his Fourth Amendment privilege against unreasonable searches and seizures was a hybrid form of procedure. The usual search envisions the police as the active party, and the defendant as the person being physically searched or acquiescing in the search of his person. But the borderline situation can arise, where, as here, it is the defendant, without the physical active intercession of the police, who is instrumental in bringing to light the incriminating evidence that engenders probable cause for arrest and the search and seizure incidental thereto. The question then becomes one of whether the defendant's revelatory action was a product of his free will or whether his will was overridden by police duress. In other words, was the warrantless search and seizure not incidental to an arrest in effect a search and *594 seizure by consent of defendant or a voluntary disclosure by him of the evidence eventually seized?
The police knew that defendant had been reported as spending money freely on or immediately prior to June 16, 1967. They knew that about $100 had been taken from the victims and had reason to believe that any suspect questioned might still have a red wallet containing the charge and deposit plates and a large amount of money on his person so soon after the commission of the crimes. The defendant, once at the Detective Bureau, was asked how much money he had with him. He was also requested by Lieutenant Graber of the Prosecutor's Office to empty his pockets, for the legally valid reasons previously mentioned.
In Kelley v. United States, 111 U.S. App. D.C. 3965, 298 F.2d 310 (D.C. Cir. 1961) and United States v. Butler, 223 F. Supp. 24, 25 (W.D. Texas 1963), the defendants, although overtly unsuspicious in appearance, were subjected to such persistent and authoritative interrogation as to the contents of their pockets and belongings that, although there was no physical restraint, the courts said that defendant "would have been `rash indeed' to suppose he was not in the power of the officers," and they found the search to be non-consensual by implication, since it occurred while defendants were under duress. On the other hand, the questioning by the police here, during the short period of time in police headquarters or prior thereto, was not of that character. The defendant was unsuspicious in appearance (except for the stains on his shirt which might or might not have been blood), was no more than one suspect among several, and was found by the detectives who picked him up in an unsuspicious environment. Cf. State v. McWeeney, 216 A.2d 357 (R.I. Sup. Ct. 1966) and State v. Contursi, 44 N.J. 422 (1965). The total facts and circumstances here indicate that the defendant was not found in any activity or environment which would grind his freedom of action into submissiveness out of apprehension of the officers' reaction to his appearance or what they saw him doing. He *595 had been drinking but was not drunk. His manner displayed a degree of sullenness rather than any submissiveness during his entire short period of contact with the police. Nor was the questioning, the bit of it that there was, ruthless or persistent, communicating to the defendant, by its tone, that no recalcitrancy on his part would be countenanced. The same freedom available to the defendant to leave at any time, discussed above, continued through to defendant's formal arrest. There was no police duress during the entire period up to that arrest.
The fact that defendant was at police headquarters does not necessarily negative voluntariness of the consent to the search. State v. King, 44 N.J. 346, 353, 9 A.L.R.3d 847 (1965). Here, at or before the time the incriminating plates were uncovered, defendant was still one of a number of suspects; was not in custody, restraint or under arrest; had neither denied nor admitted guilt of any crime; had not refused to respond to any requests by the police to empty his pockets or as to whether he had any money; had no reason to believe the police would find the incriminating evidence in the wallet  indeed, he asked that they not touch it after he threw it on the desk since it was his mother's; and, although in command of his faculties but somewhat sullen and peevish in manner (probably caused in large measure by the liquor he had consumed), he cooperated fully with the police by throwing the $12.55 on the desk when they asked whether he had any money and also by thereafter throwing the black wallet on the desk. The fact that, by reason of his petulance, he threw the non-incriminating black wallet with such force as to dislodge and reveal the incriminating deposit and charge plates contained therein does not make the disclosure thereof involuntary or non-consensual. I find that the State has sustained the burden of proof which it would have even if defendant had been in legal custody  i.e., that it has proven by clear and positive testimony that the disclosure of these items of evidence was plainly and unequivocally free, voluntary and *596 consensual  even though, as far as defendant was concerned, it was accidental in the sense that he did not know they would be revealed when he threw the wallet down. See State v. King, supra, at pp. 352-356. Defendant should not be heard to complain because his calculated risk in voluntarily complying with the officers' requests accidentally worked to his disadvantage by reason of his own actions. United States v. Vita, 294 F.2d 524, 529 (C.C.A. 2, 1961).

III
When the charge and deposit plates were revealed, the police, who knew that the plates had been taken from one of the victims, for the first time had probable cause for arrest. Probable cause for arrest may arise out of a permissible detention of a suspect, instituted on something less than probable cause when, during the detention, incriminating evidence comes to light. State v. Bell, 89 N.J. Super. 437 (App. Div. 1965). In Bell, a detention for a moving traffic violation ripened into probable cause for arrest for a narcotics violation and a valid search and seizure incidental thereto, when narcotics paraphernalia was observed lying beside the stopped car, which paraphernalia had obviously been hurriedly thrown there when the car came to a stop. So, here, the sudden disclosure of the charge and deposit plates while defendant was temporarily detained as a suspect, gave the police the evidence which, in the light of their knowledge of the crimes and the identifying data concerning the alleged perpetrator thereof, was sufficient to establish probable cause to arrest defendant without a warrant.
Probable cause for arrest without a warrant exists where, as here, the totality of evidence, including hearsay evidence and other normally incompetent evidence in the hands of the police, is sufficient to engender a belief, stronger than mere suspicion, but weaker than belief beyond a reasonable doubt, that the defendant arrested had committed the crimes. All of the evidence taken as a result *597 of the arrest in this case was incidental to a lawful arrest and was not the result of an unreasonable search and seizure in violation of the Fourth Amendment. And, under the circumstances here, even if there were time to procure a search or arrest warrant  and I do not decide that there was , that fact would not invalidate the arrest or search and seizure without a warrant. State v. Contursi, 44 N.J. 422, 429 (1965); State v. Doyle, 42 N.J. 334, 343 (1964); State v. Burnett, 42 N.J. 377, 387 (1964); State v. Fioravanti, 46 N.J. 109, 122 (1965). See also State v. Rudd, 49 N.J. 310 (1967).

CLAIMED VIOLATION OF THE FIFTH AMENDMENT
Defendant contends, alternatively, that the colloquy between the detectives and himself, was not preceded by the warnings which Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) requires. Consequently, he argues, in support of his motion to suppress the evidence seized, that, since under Miranda, "the prosecutor may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant * * *." (384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706), and since any statements he gave to the police without the Miranda warnings may not be used, so the items seized as a result of the statements, are themselves tainted and should be suppressed as violative of the Fifth Amendment.
Defendant's Fifth Amendment argument may be answered several ways.
First, defendant's money and black wallet were not produced pursuant to the "custodial interrogation" to which Miranda applies. Miranda defines prohibited custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" (384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d *598 at 706). This is what the Court meant in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), when it spoke of an investigation which was focused on the accused  i.e., "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect * * * when the process shifts from investigatory to accusatory  when its focus is on the accused and its purpose is to elicit a confession * * *." (84 S.Ct. at 1765, 1766). See fn. 4 of Miranda, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706.
In the discussion of the Fourth Amendment I have already found that defendant at no time was in custody, under arrest or deprived of his freedom in any significant way either prior to or at police headquarters until his formal arrest. Until that point the inquiry had not begun to focus on him as a suspect to be accused of the crimes. Whatever questions were asked of him throughout were part of the traditional police routine of questioning only one of six to eight suspects in an unfocused investigation. Miranda was not intended to hamper such traditional functions of police officers in investigating crime. 384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed.2d at 725. In White v. United States, 222 A.2d 843 (D.C. Ct. App. 1966), such a "traditional function" was held to be the
"* * * non-coercive questioning * * * carried on in the course of a routine police investigation prior to arrest * * * [which] may well result in exculpation * * * checking the story of a suspicious person is certainly permissible within reasonable bounds."
See also Commonwealth v. O'Toole, 351 Mass. 627, 223 N.E.2d 87, 90 (Sup. Jud. Ct. Mass. 1967); United States v. Davis, 259 F. Supp. 496, 497, 498 (D. Mass. 1966); State v. Rudd, 49 N.J. 310, 316 (1967); Brown v. United States, 125 U.S. App. D.C. 43, 365 F.2d 976, 979 (D.C. Cir. 1966).
The earliest point in this case at which either the Fourth or Fifth Amendment protections could have applied *599 came at the time the incriminating plates appeared as a result of police investigatory techniques outside the ambit of Miranda, and at that point defendant was formally arrested and immediately advised of his Miranda rights. Prior thereto he was not in custody or deprived of his freedom of action in any significant way, and the police questioning or the evidence resulting therefrom did not violate his Fifth Amendment privilege.
Even if "custodial interrogation" were found to have occurred prior to his formal arrest, defendant's Fifth Amendment argument would fare no better. Defendant's physical acts at the police station of throwing down the money and the wallet are not within the category of evidence of a testimonial or communicative nature which is all that the Fifth Amendment protects against.
Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), dealing with the involuntary taking of a blood sample as a Fifth Amendment incursion, delimited the scope of the privilege protected by the Fifth Amendment as follows:
"* * * the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature * * *." (384 U.S. at 761, 86 S.Ct. at 1830, 16 L.Ed.2d at 914.)
Of course, as Schmerber indicates, one can incriminate himself by something other than oral or written statements. Thus,
"* * * A nod or a head-shake is as much a `testimonial' or `communicative' act * * * as are spoken words * * *." (384 U.S. at 761, 86 S.Ct. at 1830, 16 L.Ed.2d at 914, fn. 5.)
But defendant's acts at police headquarters were not testimonial or communicative in character  i.e., intended by him as the substitute for words. Cf. Rule 62(1) of Rules of Evidence, effective September 11, 1967. Whether a physical act is communicative in the sense of being a substitute for *600 words for Fifth Amendment purposes has to be determined in a reasonable fashion based on the nature of the act under the circumstances of the case. Here, from the testimony narrating the events in Police Headquarters, I find defendant's acts of throwing down the money and the wallet to be only spontaneous movements in response to police requests, completely unmotivated by communicative intent or envisioned by the defendant as a substitute for words. I find that such acts in no way may reasonably or objectively be considered verbal substitutes or testimonial or communicative in nature so as to be entitled to protection under the Fifth Amendment. See also Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, 789 (1967), finding clothing seized to be neither "testimonial" nor "communicative" within the meaning of that phrase in Schmerber.

CLAIMED VIOLATION OF THE SIXTH AMENDMENT
Defendant finally contends that the "search" of his person at the police headquarters was a critical stage of the proceedings and that such search without counsel present violated his rights under the Sixth Amendment.
Defendant would be entitled to counsel under the Sixth Amendment only if a search of his person and the resulting seizure of evidence may be said to constitute a critical stage or step in the criminal process during which the absence of counsel would affect the fairness of the trial itself. In United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Court regarded itself as obligated to scrutinize
"* * * any pretrial confrontation of the accused [with the State] to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's *601 rights inhere in the particular confrontation and the ability of counsel to help avoid that prejudice." (87 S.Ct. at 1932).
A critical stage in the criminal process is thus one in which defendant's rights may be lost, defenses waived, privileges claimed or waived, or which in some other way substantially may affect the outcome of the case. See Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d (1961). In Escobedo and Miranda, supra, the point at which defendant was taken into custody and interrogated "inquisitorially" was found to be such a "critical stage," since if no counsel were present, the State could, by duress or suggestion extract admissions from the suspect in violation of his Fifth Amendment privilege against self-incrimination which, despite cross-examination, could later be used damagingly at trial. In Wade, supra, the line-up, on a post-indictment confrontation of the accused with the complaining witness, was held to be a "critical stage," for a courtroom identification could very well mean the difference between acquittal and conviction and the difference between an unequivocal courtroom identification and an impeachable one very often rests on whether the identifier saw the accused at the line-up. Without the presence of counsel at the line-up, the identifying witness could be subjected to a multitude of dangerous variables and defendant could be subjected to police abuses which only the presence of counsel could protect against: e.g., defendant could be lined up with non-comparable persons, or the police may talk to the identifying witness or suggest things to him not of his own choice. Thus ignorant and without counsel, an accused would have little chance of redeeming the situation at trial through cross-examination.
In view of this approach to the "critical stage" at which counsel is required under the Sixth Amendment, was the search and seizure here such a "critical stage?"
Search or seizure of physical items is totally unlike interrogation or identification at a line-up, but rather is similar to the taking of blood samples, clothing, shoes, fingerprints *602 and the like which have been held to be non-critical stages at which counsel is not required under the Sixth Amendment. Wade, supra, 87 S.Ct. at 1933; State v. Speciale, 96 N.J. Super. 1, 9 (App. Div. 1967). Such damage or prejudice to defendant, if any, resulting from the search or seizure without counsel's presence may be obviated or nullified by counsel at a later point in the criminal proceedings.
The very institution of the pretrial motion to suppress, permitted by our Rules (R.R. 3:2A-6), with its accompanying briefs, arguments and testimony in open court as to the facts and circumstances of the search and seizure acts as a positive protection of the defendant's later rights. The existence of such pretrial machinery makes evident that the search or seizure itself is not a critical stage, but rather the motion to suppress is. The search and seizure are very much like an arrest; they are crucial and necessary steps in the criminal investigatory process, but they are not steps at which the presence or absence of counsel would have any substantial effects on the police officers' actions to defendant's detriment which could not later be remedied by counsel before trial.
Moreover, I have already held, in discussing the Fourth and Fifth Amendment questions, that neither of these constitutional rights of defendant had been violated. The presence of counsel, therefore, while or before he was at Police Headquarters, could not have assisted him with respect to any of these rights. Schmerber, supra, 384 U.S. at 767, 86 S.Ct. at 1834, 16 L.Ed.2d at 917; State v. Speciale, 96 N.J. Super. 1, 9 (App. Div. 1967). In Speciale defendant claimed the failure of the police to warn him of his right to counsel before his shoes were seized, was an incursion into his Sixth Amendment rights. The court rejected this contention, and said, citing Schmerber and Wade, supra, that
"the advice of a lawyer would have been fruitless as there was an absolute right on the part of the police in the circumstances to take the shoes for analysis."
*603 The graver problem inherent in accepting defendant's contention that search or seizure or a lawful arrest to which it is incident is a crucial step for Sixth Amendment counsel purposes is that such a ruling would be tantamount to holding that counsel must be present any time the accused confronts the power of the State. This in effect might require not only a lawyer-in-residence at every stationhouse but also in every squad car and at the side of every foot patrolman before the police may arrest or search and seize. A requirement of this kind would be totally unrealistic and impractical.
Nor does defendant's thesis take into account the arrest or the search with a warrant. If defendant is correct, these, too, would require an attorney's presence at the time of arrest or search and seizure, for such events would be just as prospectively crucial to defendant's case as when no warrant were issued. The fact is, that arrest and search and seizure have been kept ex parte for the simple reason that it would be impossible, physically, to make them adversary proceedings and still run a police department or investigate a criminal event.
In any event, Wade may be distinguished from the present case. Wade involved identification; the present case search and seizure. In an area of the law as sensitive and as critical as criminal administration, changes should not be casually innovated and Wade should be held, at least at present, to its facts. In addition, Wade was a post-indictment case, while the search and seizure, which are the subjects of this motion, took place before the return of the indictment. No case as yet holds Wade equally applicable to a pre-indictment situation, State v. Sinclair, 49 N.J. 525, 545, fn. 1 (1967).
For the foregoing reasons, defendant's motion to suppress the enumerated articles is denied.
NOTES
[1] As used herein, unless otherwise indicated, the term "possible suspects" or the term "suspect" is in no way intended to indicate that the person involved was a suspect in the legal sense of being someone who had entered the accusatory stage at the time involved  i.e., a prime suspect or a person upon whom the enforcement authorities had already focused their attention as a real or prime suspect or the perpetrator of the crimes. They refer only to those under investigation by the police.
[2] It is unclear from the evidence whether the plates fell from the wallet or were thrown on the desk with the wallet. In either event, the result is the same. Defendant's own behavior in throwing the wallet brought the plates into open view on the desk. It will be assumed herein, however, and I so find, that the plates fell out of the wallet.